W.S.A., INC., d/b/a **Harmon Contract, Appellant,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Appellee.**

No. 92–3578.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1993.

Decided Oct. 21, 1993.

Elizabeth S. Wright, Minneapolis, MN, argued (Craig D. Diviney, on the brief), for appellant.

Donald W. Niles, St. Paul, MN, argued (Mark W. Haigh, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

W.S.A., Inc., d/b/a Harmon Contract (Harmon), appeals the district court's [1] order granting summary judgment in favor of Liberty Mutual Insurance Company (Liberty) and denying Harmon's motion for summary judgment. In their cross-motions for summary judgment, Harmon and Liberty stipulated that the insurance policy at issue excludes from coverage liability incurred by a joint venture that is not named as an insured. Harmon contends that the district court erred in finding that Harmon was a member of a joint venture. We affirm.

## I. BACKGROUND:

Harmon and Liberty stipulated to all the material facts. (*See* Jt.App. at 117–180.) Harmon is a Minnesota corporation engaged in, among other things, the business of installing architectural glass and designing and installing curtain wall systems for commercial buildings. (*Id.* at 117.) Harmon contracted with Liberty for insurance coverage for property damage liability incurred by the corporation. (*Id.* at 118–19.) The policy contains an exclusion that provides as follows:

> This insurance does not apply to **bodily injury** or **property damage** arising out of the conduct of any partnership or joint venture of which the **insured** is a partner or member and which is not designated in this policy as a **named insured**.

(*Id.* at 119.)

In April of 1983, Harmon and another company, Antamex, entered into a subcontract agreement with Gilbane Building Company (Gilbane), the construction manager in charge of a building construction project located in Lyndhurst, Ohio, known as the TRW project. (*Id.* at 117.) Harmon and Antamex subcontracted with Gilbane to provide the components for and install the curtain wall system and the exterior structural steel cladding system for the TRW project. (*Id.* at 118.)

In the subcontract, Gilbane agreed to pay "the trade contractor" the amount of $5,764,500 for satisfactory completion of both the curtain wall and external structural steel cladding systems. (*Id.* at 124.) To facilitate the terms of the subcontract, Harmon and Antamex entered into an agreement entitled "Joint Venture Agreement," (*id.* at 118, 132), which stated that the parties "wish to form a joint venture for the purpose of the Project." (*Id.* at 132.) This agreement enabled Harmon and Antamex to become one "trade contractor" for purposes of the subcontract with Gilbane. The subcontract with Gilbane listed the trade contractor as "Harmon Con-

[1]. The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

tract Glazing Inc. Antamex Ltd. Joint Venture." (*Id.* at 123.)

The agreement between Harmon and Antamex provided that Antamex was responsible for fabricating the curtain wall and exterior aluminum structural steel beam and column cladding, pursuant to the specifications of the Architect, and for delivering it to the TRW job site; Harmon was responsible for installing and caulking the cladding under supervision of the construction manager, Gilbane. (*Id.* at 118, 139–41.) The agreement also provided that the "Joint Venture" would open a bank account to accept payments under the subcontract. (*Id.* at 145.) The parties agreed to split the contract price as follows: Harmon was apportioned $2,136,000, and Antamex was apportioned $3,628,500. (*Id.* at 142–43.)

The Gilbane subcontract required the trade contractor to provide Gilbane with certificates of insurance certifying that the trade contractor was protected on the work by bodily injury and property damage insurance. Harmon and Antamex each provided certificates of insurance to Gilbane. (*Id.* at 119.) Liberty issued the certificate on Harmon's behalf. Harmon's policy did not list the agreement between it and Antamex as a named insured joint venture.

The parties substantially completed the TRW project by August 20, 1985, and Harmon and Antamex provided Gilbane with a written warranty for the finished product. In January of 1989, the exterior structural steel beam and column cladding system of the TRW building began leaking, causing damage to structural steel components. A report detailing the cause of the leakage alleged that Antamex and Harmon, among others, were responsible for the problem. (*Id.* at 119, 156–65.)

Antamex settled the claim against it by paying approximately $330,000 to TRW and Gilbane jointly. (*Id.* at 121.) Harmon settled the claim against it by paying $230,000 to TRW and Gilbane jointly, and incurring $164,054 in labor and materials to remedy the leakage problem; Harmon also incurred approximately $87,576 in defense costs. (*Id.* at 120–21.) Harmon notified Liberty of the claim and requested payment for the costs it incurred in settling the dispute. Liberty denied the claim based upon the joint venture exclusion in the policy. (*Id.* at 121.)

Harmon brought suit against Liberty seeking reimbursement for damages in the amount of $605,932.06, plus interest, for breach of the insurance contract. Harmon claimed that its relationship with Antamex did not constitute a joint venture. Both parties moved for summary judgment, stipulating that if the relationship between Harmon and Antamex was not a joint venture, the joint venture exclusion does not apply and Liberty must pay Harmon $481,629.83 on the policy; however, if the relationship was a joint venture, the policy exclusion applies and Harmon is not entitled to recovery. (*Id.* at 121–22.) The district court found from the stipulation of undisputed facts and relevant documents that the business relationship between Harmon and Antamex was a joint venture and therefore Liberty was not obligated to indemnify Harmon's losses.

Harmon contends on appeal that the district court erred in finding that Harmon and Antamex were engaged in a joint venture. Harmon argues that the district court placed too much emphasis on the label of the agreement and that the agreement did not contain all essential elements of a joint venture under Ohio law. Harmon contends that the relationship was a mere business consortium entitled to coverage under the policy. Liberty contends that a joint venture existed under either Minnesota or Ohio law.

## II. STANDARD OF REVIEW:

We review a grant of summary judgment de novo, viewing inferences to be drawn from the underlying facts in the light most favorable to the opposing party. *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1489–90 (8th Cir.1992). "Summary judgment is inappropriate when the record permits reasonable minds to draw conflicting inferences about a material fact." *Ozark Interiors, Inc. v. Local 978 Carpenters*, 957 F.2d 566, 569 (8th Cir.1992). Because this case was decided on cross-motions for summary judgment and a stipulation of undisputed facts, the parties agree that there are no

disputed issues of material fact. *Coca–Cola Bottling Co. v. Teamsters Local Union No. 688*, 959 F.2d 1438, 1440 (8th Cir.1992). The remaining question is whether the district court was correct in finding that Liberty is entitled to judgment as a matter of law. "We review the District Court's legal conclusions *de novo.*" *Id.*

At issue is whether the relationship between Harmon and Antamex was a joint venture within the meaning of the joint venture exclusion listed in Liberty's insurance contract. "The general rule is that interpretation of a contract is for the court," and "[i]nterpreting the plain language of a contract is a question of law." *Realex Chem. Corp. v. S.C. Johnson & Son, Inc.*, 849 F.2d 299, 302 (8th Cir.1988). In this case, neither party contends that the language of the insurance policy exclusion is ambiguous, but they dispute the meaning of the language used in the "Joint Venture Agreement" between Harmon and Antamex. Even if this amounts to ambiguity in the "Joint Venture Agreement," we have said that to the extent the court can construe an ambiguous phrase without resort to extrinsic evidence, the court is deciding a question of law. *Id.*

## III.  DISCUSSION:

■■ Harmon argues that the elements of a joint venture under Ohio law are not satisfied by the terms of this "Joint Venture Agreement."[2]  In Ohio, there are five essential elements to a joint venture: (1) an agreement to engage in a specific business enterprise, either express or implied; (2) an intent by the parties to associate themselves as joint adventurers, a determination governed by ordinary rules of contract interpretation and construction; (3) a community of interest in the enterprise; (4) equal authority or right to direct the movements and conduct of each other; and (5) sharing of profits and losses. *See Silver Oil Co. v. Limbach*, 44 Ohio St.3d

120, 541 N.E.2d 612, 615 (1989); *Ford v. McCue*, 163 Ohio St. 498, 127 N.E.2d 209, 212–13 (1955). Stated another way:

> [A] joint venture is " * * * an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other co-adventurers * * *."

*Silver Oil Co.*, 44 Ohio St.3d at 122–23, 541 N.E.2d at 615 (1989) (quoting *Ford*, 127 N.E.2d at 209) (alterations in original). Of the five "essential elements," neither party disputes the existence of a written "Joint Venture Agreement," which is included in the parties' stipulation of undisputed facts, or that there was a common interest in completing the project. Harmon disputes the remaining three elements: intent, joint control, and sharing of profits and losses.

As to intent, Harmon argues that the terms of the "Joint Venture Agreement" indicate that Harmon and Antamex did not intend to form a joint venture and that the district court placed too much emphasis on the labels used. The general rule is that "courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (1992). Harmon and Liberty have stipulated that the terms of the "Joint Venture Agreement" define the nature of the relationship between Harmon and Antamex. (Jt.App. at 118.) The terms of the "Joint Venture Agreement" are plain and clear. The document is entitled "Joint Ven-

---

**2.**  The insurance contract is subject to Minnesota law and the "Joint Adventure Agreement" states it is to be governed by Ohio law. Applying Minnesota's choice of law rules, it is unnecessary to make a choice of law unless one state's law would be "outcome determinative" by reason of an actual conflict. *Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, 46–47 (Minn.1978), *aff'd*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).  In this case, the district court determined, and we agree, that no choice was necessary because Ohio and Minnesota law on joint ventures are very similar and a joint venture existed within the meaning of the insurance policy under either state's laws.  Because Harmon's contentions on appeal are based on Ohio law, we confine our discussion to Ohio law.

ture Agreement." (*Id.* at 132.) On the first page, the parties state that they "hereto wish to form a joint venture for the purpose of the Project." (*Id.*) Section 3.01 of the agreement is entitled "Establishment of Joint Venture." (*Id.* at 138.) It states as follows:

The Parties hereby establish a joint venture effective as of the date hereof to carry out the Project in accordance with the provisions of the Contract, including all warranty obligations relating thereto. No other business and no other transactions of any type or nature other than those necessary for performance of the Contract shall be performed by the Joint Venture.

(*Id.*) Throughout the agreement, Harmon and Antamex use the term "Joint Venturer(s)" or "Joint Venture" over 40 times to describe themselves and the agreement. While what the parties chose to call themselves and their relationship is not conclusive, it is, in our judgment, a huge fact in determining what legal relationship they intended to create.

When a contract is clear and unambiguous, a party cannot later complain that the plain language is contrary to his intentions; "[t]here simply is no room in our jurisprudence for a doctrine that seeks to rescue the inattentive from the operation of well-accepted notions of contract interpretation." *Shifrin,* 597 N.E.2d at 503 (Wright, J., concurring). It is clear from the terms of the agreement that the term "Joint Venture" is not a mere heading, as Harmon contends. It is a term used to define the substance of the contract. It is itself defined in the contract and is used consistently throughout. In the face of such clarity, Harmon cannot now claim that the plain language is contrary to the parties' intentions.

Harmon next contends that the agreement falls short of establishing a joint venture because the parties to the "Joint Venture Agreement" did not have equal control. Although most of the control was divided between the parties, the agreement indicates in various provisions that each party retained some control over the whole project and over each other. For example, the agreement

provided that Antamex was responsible for preparing and submitting invoices to the construction manager on behalf of the joint venture. (Jt.App. at 145.) The agreement required each to perform its own portion of the work in a timely manner to allow adequate time for the other party to perform; if one party failed to meet target dates for completion of work, the other could assess certain penalties against the nonperforming party. (*Id.* at 146–47.) The parties agreed that the joint venture would open a bank account in its name and a representative of each party, signing together, would be authorized to write checks on behalf of the joint venture. (*Id.* at 145.) The agreement required each party to carry insurance and to name the other party as an additional insured under its liability policy,[3] and prescribed that the policy cannot "be cancelled or terminated without first giving ten (10) days written notice to the other Joint Venturer." (*Id.* at 148.)

Further, equal control over every aspect of the project is not required. Instead, "[e]ach must have some voice and right to be heard in" the control and management of the joint venture. *De Marco v. Lucas,* 61 Ohio Law Abs. 182, 103 N.E.2d 583, 585 (Ct.App.1951). It is permissible for joint venturers to surrender control over some aspects of the project to the other joint venturer without defeating the joint venture. *Kahle v. Turner,* 66 Ohio App.2d 49, 420 N.E.2d 127, 130 (Ct.App.1979). Harmon and Antamex indicated in many instances that they were surrendering control of specific parts of the venture to the other party. Under *Kahle,* however, this does not work to defeat a joint venture relationship. Given the express contract provisions which indicate some amount of control over each other and the project and some voice in the control and management of the project, we find that the element of control is satisfied.

Finally, we consider whether the agreement called for a sharing of profits and losses sufficiently to establish a joint venture relationship. The parties to a joint venture must divide profits and losses. *Silver Oil,* 541 N.E.2d at 615. In *Silver Oil,* losses were not

---

3. Harmon did not abide by this provision of the agreement because neither Antamex nor the

claimed joint venture was an additional named insured on Harmon's policy with Liberty.

specifically shared, but the court found that since certain expenses were not reimbursable under the agreement, the arrangement was tantamount to sharing the loss. *Id.* at 616.

In *Kahle*, 420 N.E.2d at 130, the court found that a joint venture relationship existed between Turner, an amusement ride operator who supplied and operated the rides on which an injury occurred, and a VFW Post, which sponsored the fair by supplying the land where it was located. The parties divided gross receipts from the amusement rides and each was responsible for the cost of materials, supplies, and personnel furnished by that party. *Id.* Turner and the VFW Post argued, in part, that a joint venture did not exist because there was no sharing of expenses and no agreement to share losses. *Id.* The court stated that those characteristics of the relationship were not determinative in that case, holding that sharing expenses is not a necessary element of a joint venture, and that an agreement to share losses may be implied. *Id.* The court noted that "[t]here is no reason why the parties cannot agree as to * * * 'which part of the expense each should bear before participating in profits. * * *'" *Id.* (quoting *Albina Engine & Mach. Works v. Abel*, 305 F.2d 77, 82 (10th Cir.1962)).

In this case, the potential profit based upon the contract price was known from the start, and Harmon and Antamex expressly agreed to split the gross contract price in a particular manner. The Gilbane subcontract paid "the trade contractor" a specified price; Harmon and Antamex entered into the "Joint Venture Agreement" to facilitate that method of payment. The parties agreed to split the contract price in a particular manner. The agreement provided that any changes in the contract resulting in "extras" and "deletes" would be apportioned between the parties in accordance with the division of responsibilities outlined in the contract. (Jt.App. at 143.) The agreement required the laboratory cost of testing the "mock-up" to be borne initially by Harmon, then any profit with respect to the "mock-up" would be shared equally and any loss borne solely by the party causing the loss. (*Id.*) The parties agreed to share the amount of any holdback

from time to time with respect to the TRW project in proportion to their respective entitlement to the contract price. (*Id.* at 146.) They further agreed that all costs and premiums incurred in connection with the issue of bonds required for the project would be shared equally by the parties. (*Id.*) The agreement also expressly provided that the benefits and obligations under it were separate and not joint or severable or joint and several. (*Id.* at 102.)

Harmon argues that there is no express agreement to share losses and that each was responsible for losses attributed to its own actions. We find, however, that an express agreement apportioning gross profits and delineating which party will bear which expenses and losses is consistent with a joint venture relationship. The agreement specifically provides that each party will bear losses relating to their own responsibilities or that they caused. Thus, we find that the parties shared losses as well as profits. Losses were not shared equally perhaps but were apportioned between the parties as predetermined by the express agreement.

Harmon also argues that the relationship between itself and Antamex was merely a business consortium, not a joint venture. Although plausible in the abstract, this contention is refuted by the plain language of the "Joint Venture Agreement."

In sum, Harmon and Antamex, by the express language of their "Joint Venture Agreement," combined their effort, skills, property, money, and knowledge to contract for, complete, and warrant a certain portion of the TRW building project. This single project was the entire objective of the agreement. We hold that, given the express language of the contract between Harmon and Antamex, they established a joint venture for the purpose of completing the TRW project and that, because the joint venture was not a named insured under Harmon's insurance policy with Liberty, the joint venture exclusion applies to prevent Harmon from recovering under the policy.

Prior to submission of the case, Harmon moved to correct an alleged error in the record. The transcript of the summary judgment hearing shows that Harmon's attorney

stated that he did not draft the "Joint Venture Agreement" but that his firm did. Harmon would have the record show that its attorney actually stated that his firm did *not* draft the "Joint Venture Agreement." Liberty objects, contending that the transcript is accurate. A determination of who drafted the "Joint Venture Agreement" is not material to our holding in this case. Accordingly, we deny the motion.

We affirm the judgment of the district court.

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I believe the parties' business relationship is more aptly described as a consortium and, accordingly, I dissent.

A "consortium is distinguished from a joint venture in that the consortium members generally do not have a joint interest in the subject matter of the venture (for example, the project to be constructed), do not share in the profits or losses of the venture, and do not undertake any fiduciary duty toward each other unless expressly agreed to under the consortium agreement." Construction Joint Ventures: Forms & Practice Guide 16 (M. Becker & R. Suchsman eds. 1992). In the context of joint ventures, the term "profits" is defined as "the gain realized from business or investment over and above expenditures." *L & H Leasing Co. v. Dutton,* 82 Ohio App.3d 528, 612 N.E.2d 787, 791 (Ct.App.1992). The parties in this case made no agreement about the sharing of the "gain ... over and above expenditures," but instead merely agreed how to divide certain expenses and the gross receipts. As illustrated in *Shaver v. Shirks Motor Express Corp.,* 163 Ohio St. 484, 127 N.E.2d 355 (1955), an agreement to share revenues is different from an agreement to share profits and cannot form the basis for a joint venture. There, the court noted that two parties had agreed to share revenues from a venture, but noted that "what profits Shirks would make was of no interest to Wiggins, and certainly if

Shirks should incur a net loss on his contract, Wiggins would not share in it." *Id.* at 361; *see also Fedderson v. Goode,* 112 Colo. 38, 145 P.2d 981, 985 (1944) ("The chief characteristic of a joint adventure is joint and not a several profit.") (quotation omitted) (cited with approval in *Ford v. McCue,* 163 Ohio St. 498, 127 N.E.2d 209, 213 (1955)). This principle was further illustrated when the Ohio Supreme Court emphasized that "the profit accruing must be joint and not several." *Ford,* 127 N.E.2d at 213. Because the parties did not share in the *profits,* I cannot conclude their relationship was a joint venture.[1]

While I realize that the parties' numerous use of the term "joint venture" has muddied the water in this case, I do not agree that the parties consistent reference to their arrangement as a joint venture precludes a question of fact on the issue of their intent. The use of the phrase is certainly evidence of their intent, but I do not believe it is conclusive because the phrase has a rather common meaning in everyday parlance. One looking up the phrase "joint venture" in the dictionary is referred to the definition for "joint adventure", Webster's Third New International Dictionary 1220 (1971),[2] which is defined as "a partnership or cooperative agreement between two or more persons restricted to a single specific undertaking." *Id.* at 1219. Thus, in its non-legal sense, the phrase "joint venture" has a much broader meaning than the one ascribed by law and encompasses what the law refers to as business consortiums as well as joint ventures. People entering contracts should not automatically be held to the specialized and technical meanings assigned by the legal profession; after all, ordinary people routinely use ordinary words and phrases, unaware of the specialized meanings attributed to them by the law.

parties' word choices can override the requirement that profits be shared.

---

1. The majority rejects Harmon's claim that the relationship was a business consortium because of the "plain language of the Joint Venture Agreement." *Ante* at 793. To the extent that this refers to the use of the phrase "joint venture," I must disagree because I do not believe

2. The law also recognizes the two phrases as synonyms. *E.g.,* Black's Law Dictionary 753 (1979).