# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1984

_____

American Anglian Environmental     \*
Technologies, L.P.,     \*
    \*
       Appellant,     \*
    \*    Appeal from the United States
   v.     \*    District Court for the Eastern
    \*    District of Missouri.
Environmental Management     \*
Corporation,     \*       [PUBLISHED]
    \*
       Appellee.     \*

_____

Submitted: February 16, 2005
Filed: June 21, 2005

_____

Before WOLLMAN, HANSEN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

In December 1994, American Anglian Environmental Technologies, L.P. ("AAET") and Environmental Management Corporation ("EMC") formed a limited liability company – EA2 Systems, L.C (the "company"). As required by state law, AAET and EMC adopted an Operating Agreement. *See* **§§ 347.081.1**, **347.015 (13) RSMo 1994**. By the Agreement, AAET and EMC each owned 50 percent as a "Member." The Agreement contained a buy/sell provision allowing either AAET or EMC to make an unconditional offer/acceptance at a price it chose – forcing the

offeree to choose *either* to buy the offeror's entire interest, *or* to sell the offeree's entire interest.

On March 26, 2001, EMC made an unconditional offer to sell its half – or buy out AAET – for $4,231,629.50, based on a total value of $8,463,259.00. On July 23, AAET opted to buy EMC's half. Closing was set for September 20.

On August 21 – before closing – the company distributed $500,000 in cash, half to EMC and half to AAET. AAET immediately demanded that EMC return its money. EMC refused. Nonetheless, closing occurred on September 20, 2001.

After closing, AAET arranged independent audits of the company's financial condition as of closing. As a result, AAET claims that the company's books and records were not maintained in accordance with generally accepted accounting principles ("GAAP"). AAET asserts these accounting discrepancies reduced the company's total value by $713,000.

Invoking diversity, AAET sued EMC claiming breach of contract, breach of fiduciary duty, and breach of duty of good faith and fair dealing, and unjust enrichment. The district court granted summary judgment to EMC on all claims. AAET appeals. This court reviews de novo the grant of summary judgment, viewing the facts most favorably to AAET. *See Rose - Matson v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1997). Jurisdiction being proper under 28 U.S.C. § 1291, this court reverses in part, affirms in part, and remands.

## I.

As a Member, AAET has standing to enforce the Operating Agreement. *See* **§ 347.081.2 RSMo 2000**. AAET argues that the district court erred in granting summary judgment because the August distribution of cash is prohibited by the Operating Agreement, specifically sections 3.4(a), 5.3(a), 5.3(b), and 12.5.

The fundamental principle of interpreting operating agreements is to ascertain the intent of the parties and give effect to it. *See Goldstein and Price, L.C. v. Tonkin & Mondl, L.C.*, 974 S.W.2d 543, 551 (Mo. App. 1998). A clear and unambiguous operating agreement must be enforced according to its terms. *Id.* The parties may, however, modify a provision of the Operating Agreement by making a new contract as to it. *Id.*

**A.**

Section 3.4(a) generally prohibits distributions from the company:

> Except as expressly provided in this Agreement or by law, no Member shall be entitled to withdraw or reduce such Member's Capital Contribution or to receive any distributions from the Company.

The district court ruled that this section 3.4(a) did not apply generally to cash distributions, but only to a "distribution from Members' Capital Accounts." To the contrary, section 3.4 is clear and unambiguous when read together with section 3.3, which provides that Capital Accounts shall be maintained in accordance with IRS Regulation 1.704-1(b)(2)(iv). That Regulation requires that a Member's capital account be decreased by any "property distributed." **I.R.S. Reg. § 1.704-1(b)(2)(iv)(e)**. *See also* **I.R.S. Reg**. **§ 1.704-1(b)(5), example 14(v)**; *cf. Derges v. Hellweg*, 128 S.W.3d 186, 188 (Mo. App. 2004). Therefore, section 3.4 does prohibit cash distributions from the company to the Members except "as expressly provided in this Agreement or by law."

The district court did recognize that one kind of distribution – distributions of Net Cash from Operations – is expressly provided in the Operating Agreement. In fact, section C.6 requires such distributions:

Except as otherwise provided in Section C.7[1] or Section C.8[2] hereof, Net Cash From Operations, if any, shall be distributed not later than the ninetieth day after the end of each Fiscal Year as follows:

. . .

[after payment of debt and taxes]

. . .

(d) . . . the remainder to the Members pro rata in accordance with their Percentage Interests.

The August distribution is not authorized by section C.6, because it was made over 90 days after the end of the fiscal year on December 31.

EMC counters that, in the two preceding years, cash distributions to the Members were made in similar amounts, over 200 days after fiscal-year-end, without objection (or rejection) from either party:

| Date | Total Amount of Distributions |
| --- | --- |
| March 24, 1999 | $600,000 |
| **August 31, 1999** | **$300,000** |
| **July 31, 2000** | **$600,000** |
| October 25, 2000 | $500,000 |
| December 19, 2000 | $700,000 |
| August 21, 2001 | $500,000 (distribution at issue) |

In fact, of the five previous distributions to Members, only one occurred within 90 days after the end of the fiscal year.

---

[1]The parties agree that section C.7 does not apply to the August distribution, because it did not cause liabilities to exceed assets. *See also* § 347.109.1(2) RSMo 2000.

[2] The parties agree that section C.8 "Distributions Upon Winding Up" does not apply to the August distribution.

EMC moved for the summary judgment granted by the district court. EMC must demonstrate there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. *See* **FED. R.CIV. P. 56(c)**. EMC thus had the burden to show that the August distribution was authorized. EMC contends that it was similar to the five previous distributions. The only facts presented by EMC regarding the previous distributions were: "Each distribution was made at random dates and without formal meetings or objections at points in time that EMC determined cash in account exceeded current liabilities beyond the net of current accounts receivable and current accounts payable and liabilities."

On a motion for summary judgment, these facts are viewed most favorably to AAET, along with any permissible, reasonable inferences. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The "random dates" fact does not bring the distribution within section C.6, and viewed favorably to AAET, makes the distribution violate the Agreement. The absence of "formal" meetings, viewed favorably to AAET, does not exclude "informal" meetings. Finally, EMC determined the distribution on a balance-sheet basis, while the Agreement defines "Net Cash from Operations" on a net-cash-income basis. EMC did not meet its burden of demonstrating that the August distribution was authorized by the Operating Agreement.

**B.**

The district court rejected this analysis based upon its view of the exercise of authority within the company. By the Operating Agreement, day-to-day project management was the responsibility of a Project Manager appointed by EMC, assisted by a deputy appointed by AAET. Throughout the company's life, EMC managed the financial affairs and day-to-day business operations of the company. The parties agree that: "AAET consented to EMC managing the day-to-day finances of EA2 [the company] since 1995," and "EMC personnel handled the day-to-day business

operations of EA2 [the company], including the accounting and bookkeeping functions."

While EMC was the day-to-day manager of the company, the Operating Agreement establishes a Management Committee with four representatives, two each from AAET and EMC. The Agreement then empowers the Management Committee in sections 5.3(a), 5.3(b), and 12.5:

5.3 <u>Authority of the Management Committee</u>.

(a) <u>Authority.</u> The Management Committee shall have the sole and complete authority to manage and operate the business of the Company . . . . Without limitation, the Management Committee shall have the authority to:

. . .

(vii) Invest, manage, and distribute Company funds to the Members in accordance with the provisions of this Agreement .
. . .

. . .

(b) <u>Action.</u> Action of the Management Committee shall be effected by favorable vote of a majority of all members of the Management Committee, <u>provided</u> that action of the Management Committee regarding the following matters may be effected only by the unanimous agreement of all of its members:

. . .

(ii) the performance of any act in contravention of this Agreement;

. . .

(xviii) approving payments to Members or Affiliates for expenses exceeding an aggregate amount of $2,000 in any month and not within the budgets referred to in parts (xv) and (xvii) above;

(xix) approving or authorizing expenditures in excess of those authorized in the budgets referred to in parts (xv) and (xvii) above.

. . . .

12.5 <u>Bank Accounts.</u> All funds of the Company shall be deposited in a separate bank, money market or similar account or accounts approved by the Management Committee and in the name of the Company. Withdrawals therefrom shall be made only by persons authorized to do so by the Management Committee, and only as follows:

(a) for operating expenses within budgets that have been approved by the Management Committee;

(b) for capital expenditures within budgets that have been approved by the Management Committee, subject to the review by the Management Committee of the percentage of completion of a given capital project; and

(c) for other purposes as approved by the Management Committee.

The parties agree that the Management Committee did not approve the August distribution. As discussed in part A above, the August distribution violated section C.6 of the Operating Agreement. The Agreement says that "any act" – including late cash distributions – made "in contravention of this Agreement" requires the "unanimous agreement" of the Management Committee. Withdrawals of company funds must be within Management-Committee-approved budgets, or otherwise approved by the Management Committee. Emphasizing the prohibition on self-payments, the Agreement states that any payment to a Member for Project or Marketing expenses over $2,000 – not in a unanimously approved budget – requires unanimous consent of Management Committee.

The district court ruled that the Management Committee in effect delegated to EMC the authority to determine cash distributions, as to both timing and amount. The fact that EMC determined in the past that net cash was available without a "formal" meeting does not indicate how the Management Committee acted on cash distributions, if at all. The record lacks any evidence as to the procedures of, and delegation by, the Management Committee.

-7-

The district court relied on two other justifications.  First, the district court emphasized that AAET knew of a possible cash distribution while it considered whether to sell its half, or buy the other half.  EMC notified AAET in its buy/sell "trigger" letter that:

> Until the Closing, however, EA2 [the company] will continue to make cash distributions to EMC and AAET from time to time from available cashflow from operations.

In its response/acceptance to purchase, AAET stated only:

> AAET will expect EMC to continue to meet its obligations to the Company and AAET as a member of the Company and as provided in the Company's Operating Agreement. Consistent with these obligations, AAET will expect EMC to take no actions contrary to the best interests of the Company and to cause the Company to be operated in the normal and ordinary course of business through the Closing.

The parties agree that *after* the August distribution, AAET sent three letters to EMC objecting to the distribution but re-affirming the closing.  The parties vehemently dispute whether AAET objected to the continuation of cash distributions *before* the August distribution.  AAET asserts that the paragraph just quoted (from the response/acceptance to purchase) objects to distributions, by requesting that EMC not act "contrary to the best interests of the Company" and operate it in the "normal and ordinary course of business." EMC answers alternatively that AAET's response is so general that it does not address EMC's specific statement that it would continue cash distributions, or that operating in the "ordinary course" authorizes the distributions.  AAET's President – a member of the Management Committee – avers that AAET's response means that EMC should not "adversely affect the value of the assets" of the company.  On summary judgment, dispute over reasonable interpretations of material letters should not be resolved against the non-movant. *See W.S.A., Inc. v. Liberty Mutual Insurance Co.*, 7 F.3d 788, 790 (8th Cir. 1993).

Second, the district court relied on the proposition that the Operating Agreement permits distributions during the period that a buy/sell offer is outstanding. While this is accurate for the 90-day period during which section C.6 requires distributions, it does not resolve the legality of the August distribution.

The summary judgment as to the August cash distribution is reversed, and the cause remanded.

## II.

AAET objects to the remainder of the summary judgment, contending EMC did not properly keep the company books using the accrual method, thus overvaluing the company. AAET's expert testified that the books were not maintained consistent with GAAP, that adjustments and reclassifications were appropriate and necessary, and that the previous outside auditors did not make the adjustments. AAET invokes the Operating Agreement:

> 12.1 <u>Accounting Method</u>. The books of the Company shall be kept on the accrual method or any other accounting method as may be designated by the Management Committee from time to time in accordance with the [Internal Revenue] Code.

AAET concedes that EMC arranged audits of the company by a major accounting firm for the years 1995 through 2000, and that AAET received the resulting statements when completed. AAET also contends that EMC refused to disclose all the financial information AAET requested before opting to buy, so that AAET could not evaluate the effect of the accounting discrepancies.

AAET claims EMC is liable for one-half of the overvaluation due to these discrepancies. AAET's President claims that if it had known of the discrepancies prior to opting to buy:

AAET would have demanded that the [the company] EA2's books be adjusted and that the price be recalculated, would have considered selling its interest in the [the company] EA2 to EMC at the set price, or would have taken other steps in an effort to obtain relief.

AAET's requested relief is prohibited by the Operating Agreement. The Agreement here provides: once the buy/sell offer is made, it is "irrevocable," "shall not be conditioned on anything," and requires no "representations and warranties." This preempts recalculating the price and "other steps" for relief (other than enforcing the buy/sell provision). Here, accounting values are not an integral part of the buy-sell provision, and the initial offer/acceptance may not have conditions. *Compare* ***KBL Properties, LLC v. Bellin***, 900 So. 2d 1160, 1162 n.3 (Miss. 2005); ***Eikon King St. Manager, L.L.C. v. LSF King St. Manager, L.L.C.***, 109 S.W.3d 762, 764 (Tex. App. 2003); ***PAMI-LEMB I Inc. v. EMH-NHC, L.L.C.***, 857 A.2d 998, 1010 (Del. Ch. 2004).

As to the ultimate decision whether to buy or sell, AAET never states that it would have sold – rather than bought – half of the company. AAET's strongest statement is that it would have "considered" selling. The buy/sell provision in the Operating Agreement is intended to achieve finality, expeditiousness, fairness and continuity. *See* **Stevens A. Carey,** *Buy/Sell Provisions in Real Estate Joint Venture Agreements*, 39 REAL PROP. PROB. & TR. J. 651(2005). AAET cannot defeat this clear and unambiguous provision by a contingent, speculative possibility. *See* ***Hahn v. McDowell***, 349 S.W.2d 479, 482 (Mo. App. 1961); ***Lebrecht v. United Rys. Co.***, 237 S.W. 112, 114 (Mo. 1921).

In sum, this court will implement the policy of Missouri:

to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements.

**§ 347.081.2 RSMo 2004.**[3] The District Court did not err in granting summary judgment as to the accounting discrepancies.

The judgment of the district court is reversed in part, affirmed in part, and the case remanded.

_____

[3] This Missouri language is identical to that in nine other states: COLO REV. STAT. § 7-80-108(4); DEL. CODE ANN. tit. 6, § 18-1101(b); KAN. STAT. ANN. § 17–76,134(b); MISS. CODE ANN. § 79-29-1201(2); N.H. REV. STAT. ANN. § 304-C:78(II); N.J. STAT. ANN. § 42:2b-66(a); OKLA. STAT. ANN. tit. 18, § 2058(D); UTAH CODE ANN. § 48-2c-1901; WASH. REV. CODE ANN.§ 25.15.800(2); *cf.* 15 PA. CONS. STAT. ANN. § 8913 (committee comment).