**ALPHA THERAPEUTIC CORPORATION,**
Plaintiff,

Hunter Blood Center, Defendant/Third Party Plaintiff–Appellant,

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Third Party Defendant/Appellee.**

No. 89–3235
Non–Argument Calendar.

United States Court of Appeals, Eleventh Circuit.

Dec. 11, 1989.

David C. Beers, Orlando, Fla., James A. Baxter, Clearwater, Fla., Armando R. Payas, Orlando, Fla., for defendant/third party plaintiff-appellant.

Janine Nesbit Roper, Alpha Therapeutic Corp., Los Angeles, Cal., for third party defendant/appellee.

Before JOHNSON and HATCHETT, Circuit Judges, and HILL, Senior Circuit Judge.

PER CURIAM:

We affirm the judgment of the district court on the basis of the memorandum opinion of Senior U.S. District Judge Walter E. Hoffman, attached hereto as an appendix.

AFFIRMED.

APPENDIX

United States District Court, Middle District of Florida, Orlando Division.

Alpha Therapeutic Corporation, Plaintiff,

v.

Hunter Blood Center, Inc., Defendant/Third–Party Plaintiff,

v.

St. Paul Fire and Marine Insurance Company, Third–Party Defendant.

Case No. 85–855–CIV–ORL–19.

MEMORANDUM OPINION

On March 1, 1983 Alpha Therapeutic Corporation (Alpha), the original plaintiff in this action, entered into a contract whereby Hunter Blood Center (Hunter), the original defendant, agreed to sell Alpha its entire

production of human plasma.[1] Pursuant to the contract, Hunter agreed to process the plasma in accordance with applicable federal, state and local regulations and in accordance with Alpha's commodity specifications. Both applicable regulations [2] and Alpha's commodity specifications require that Hunter test its plasma for the presence of hepatitis B surface antigen (HBsAg). Hunter's method for determining the presence of HBsAg requires two separate tests for each unit of blood.[3]

In November of 1983, Hunter found four units of plasma to be reactive for HBsAg on the first test. However, due to a transcribing error made by a medical technician,[4] Hunter failed to retest the contaminated blood and instead tested four different units that were nonreactive to HBsAg. Consequently, Hunter shipped HBsAg positive plasma to Alpha which resulted in the contamination and ultimate destruction of a portion of Alpha's plasma products.

Alpha sued Hunter and Hunter's professional liability carrier, Great American–South Inc. (Great American), for breach of contract. Hunter made a demand to its general liability carrier, St. Paul Fire and Marine Insurance Co. (St. Paul), that St. Paul defend Hunter against Alpha's allegations and indemnify Hunter for liabilities arising out of the allegations. St. Paul refused, and Hunter filed a third party complaint for declaratory relief seeking to establish St. Paul's duties under its insurance contract with Hunter. Hunter's third party complaint is before this court.

St. Paul provided Hunter with a comprehensive general liability insurance policy which contains a professional services exclusion which reads:

> Professional services. We won't cover injury or damage caused by the providing or failure to provide any professional service. This includes liabilities assumed under a contract or agreement to pay for injury or damage caused by an architect, engineer or surveyor in performing or failing to perform professional services.

St. Paul contends that the language of its policy unambiguously excludes coverage for the error of Hunter's medical technician because the error was committed while providing professional services.[5]

Hunter contends that "professional service" is not adequately defined in St. Paul's policy. Consequently, argues Hunter, the policy must be construed in favor of coverage. Hunter further argues that a medical technician does not have the requisite training to qualify as a professional and that the technician's job of transposing test re-

---

1. Alpha Therapeutic Corporation is in the business of manufacturing and distributing human plasma derivatives. Hunter Blood Center is in the business of collecting and distributing human plasma.

2. Title 21 section 610.40 of the Code of Federal Regulations requires that

    Each donation of blood plasma or serum to be used in preparing a biological product shall be tested for the presence of hepatitis B surface antigen by a method of sufficient sensitivity to detect all sera labeled A, (a), B, (b) and C(c) . . .
    21 CFR § 610.40(a).

3. Hunter Blood Center uses the Auszyme II test for determining the presence of HBsAg in plasma.

4. On November 11, 1983, Hunter Blood Center tested plasma units T–25190, T–25191, T–25193 and T–25194 in testing wells 97, 98, 99 and 100 respectively. Each unit tested positive to HBsAg on the first test. On the second test, required under the Auszyme II system, the medical technician mistakenly tested the plasma units in testing wells 92, 93, 94 and 95. These wells contained different blood than wells 97, 98, 99 and 100. As a result of the error, units T–25190, T–25191, T–25193 and T–25194 were never tested a second time. The plasma units in wells 92, 93 94 and 95 tested nonreactive to HBsAg. As a result, the presence of HBsAg was not detected in plasma unit T–25193. This unit ultimately contaminated a large portion of Alpha Therapeutic's products.

5. To support its contention that the general liability policy does not cover the medical technician's error, St. Paul maintains that the professional liability policy provided by Great American–South Inc. specifically covers damages arising out of liability for testing or failing to test plasma for hepatitis. While the Great American policy does contain language supporting coverage in the instant case, that policy is irrelevant in determining the extent of coverage provided by St. Paul's policy with Hunter Blood Center.

sults is not a professional service. After reviewing the contract at issue, the testimony and the case law on this matter, this court determines that the error of Hunter's medical technician was committed while performing a professional service. Therefore, the liability arising from the error is not covered by St. Paul's general liability policy.

The law is well settled that ambiguities in insurance policies are to be construed in favor of the insured. *Hess v. Liberty Mut. Ins. Co.,* 458 So.2d 71, 72 (Fla.App. 3 Dist. 1984). However, if no ambiguities exist, a policy "must be accorded its natural meaning." *Saha v. Aetna Casualty & Surety Co.,* 427 So.2d 316, 317 (Fla. 5th DCA 1983). When determining whether a policy is ambiguous, we must bear in mind that insurance contracts are complex instruments. Consequently, "the fact that analysis is required for one fully to comprehend them does not mean the contracts are ambiguous." *State Farm Fire and Cas. Co. v. Oliveras,* 441 So.2d 175, 178 (Fla.App. 4 Dist.1983). An analysis of St. Paul's general liability policy makes clear that liability arising from the medical technician's error is excluded from coverage.

At trial of the third-party action, Robert Hannegan, the underwriting manager for St. Paul's Medical Services Department, testified that St. Paul did not charge Hunter for medical professional liability during 1983. To support this claim, St. Paul introduced into evidence Hunter's premium recap sheet, which showed no entry in the line called "medical professional liability." Mr. Hannegan testified that the absence of an entry means that St. Paul provided no coverage for medical professional liability. During 1984, however, St. Paul picked up Hunter's medical professional liability charging Hunter $6,800.00 on a pro rated basis. Thus, the evidence shows that Hunter paid no premiums for medical profession liability during 1983. Consequently, the insurance contract in effect at the time of the medical technician's error did not provide for medical professional liability coverage.

Hunter argues, however, that the technician's error was covered by St. Paul's policy without the additional medical professional liability insurance. In its trial brief, Hunter maintains that, "arguably, a medical technician is not a profession. Therefore, any act or omission of a medical technician may be construed not to be the rendering of a professional service." While Hunter concedes in its brief that "for some activities, the medical technician may be a professional," Hunter concludes that "if [an] act or omission is not performed by a professional as that term is generally understood and recognized, then the exclusion should not apply." This court cannot agree. Even if a medical technician is not a professional, there are certain professional duties that, when delegated to the medical technician, bring the technician within the definition of "professional" for insurance purposes. *Multnomah County v. Oregon Automobile Ins. Co.,* 256 Or. 24, 470 P.2d 147, 150 (1970); *see Northern Insurance Co. of N.Y. v. Superior Court, Etc.* 91 Cal.App.3d 541, 154 Cal.Rptr. 198, 200 (1st D.C.A.1979).

In *Northern Insurance,* a physician mistakenly performed an abortion on a patient because the physician's clerical employee mistook the patient for someone else. The court in *Northern Insurance* concluded that the mistake "occurred during the performance of professional services" because the doctor's duty to operate on the right patient is nondelegable. 154 Cal.Rptr. at 200. Indeed, most professional services involve clerical duties that may lead to liability.[6] While these duties typically are per-

**6.** Most professional medical services involve clerical or ministerial duties that court's typically consider as an intricate part of the professional service. *See e.g. Northern Ins. Co. of N.Y. v. Super. Ct. Etc.,* 91 Cal.App.3d 541, 154 Cal. Rptr. 198 (Cal.App. 1st Dist.1979) (administrative error of confusing patients is part of professional service); *Mason v. Liberty Mutual Ins. Co.,* 370 F.2d 925 (5th Cir.1967) (hypodermic injection by student is part of professional service); *Antles v. Aetna Casualty and Surety Co.,* 221 Cal.App.2d 438, 34 Cal.Rptr. 508 (Cal.App.2d Dist.1963) (adjusting lamp which fell and burned patient is part of professional service).

Some courts distinguish ·purely ministerial functions from those duties requiring some expertise. *See e.g. American Casualty Co. v. Hart-*

formed by a secretary or assistant, the professional is ultimately responsible for the duty. The transposing of figures in the hepatitis testing is one such duty. Hunter is in the business of providing human plasma to its customers. Hunter has a duty, imposed by both federal law and by Hunter's contract with Alpha, to test the human plasma for HBsAg. While transposing the test results may be a clerical task, if the test results are transposed improperly, the testing process fails. Clearly, transposing test results and figures is an intricate part of testing plasma for hepatitis, which is a professional service. Thus, this court finds that the medical technician was performing a professional service when the error in question occurred. As such, the liability is excluded from coverage by the professional service exclusion clause in St. Paul's policy.

/S/ Walter E. Hoffman
Senior United States District Judge
(Sitting by Designation)

At Norfolk, Virginia

June 22nd, 1988.

---

*ford Ins. Co.* 479 So.2d 577 (La.App. 1st Cir. 1985) (instructing patient to remove clothing and to climb onto examination table is purely ministerial involving no professional service); *D'Antoni v. Sara Mayo Hospital* 144 So.2d 643 (La.App. 4th Cir.1962) (raising side rails on bed is purely ministerial involving no professional service) (overruled on other grounds, *Block v.* *Reliance Ins. Co.,* 433 So.2d 1040 (La.1983)). However, the testimony of Alan Wong, the technical director at Hunter, makes clear that the transposing duty of the medical technician in the instant case is more than a purely ministerial task. Mr. Wong testified that the transcription of the test results is as important as the test itself. Trial Transcript at 67, 68.