**Darrell Robert NEUMAN,**
**Petitioner, Appellant,**

v.

**STATE FARM MUTUAL AUTOMOBILE INS. CO., an Illinois corporation,**
**Respondent.**

No. C2-91-1209.

Supreme Court of Minnesota.

Nov. 20, 1992.

John P. Clifford, Meshbesher & Spence, Ltd., Minneapolis, and Pamela Finney, Meshbesher & Spence, St. Paul, for appellant.

Kay Nord Hunt, Michael P. Shroyer, Lommen, Nelson, Cole & Stageberg, Minneapolis, for respondent.

Sharon L. Van Dyck, Schwebel, Goetz, Sieben & Moskal, Minneapolis, for amicus curiae Minnesota Trial Lawyers Ass'n.

SIMONETT, Justice.

This appeal concerns the method of stacking underinsured motorist coverages in auto insurance policies. Is the amount recovered by the insured from the tortfeasor to be deducted three times, *i.e.*, from each of the three coverages being stacked, or only once from the aggregate coverage? The trial court and the court of appeals ruled the offset should be applied seriatim. *Neuman v. State Farm Mut. Auto. Ins. Co.*, 480 N.W.2d 133 (Minn.App.1992).[1] We disagree and reverse.

1. Two days after the court of appeals decided *Neuman,* a different panel decided *Marty v.*

While driving his Ford pickup on October 26, 1985, plaintiff-appellant Darrell Neuman was involved in an accident with another car. The other car carried liability limits for a single accident of $100,000 and the insurer paid Neuman $95,000. Neuman then sought underinsured motorist benefits from his own insurer, defendant-respondent State Farm Automobile Insurance Company, but a question about stacking arose, resulting in this declaratory judgment action.

Some facts have been stipulated. The parties agree that Neuman's injury claim has the potential to exceed $95,000. They agree that State Farm's policy covering the Ford pickup provides stacking of the underinsured motorist coverages for the three vehicles owned by the insured. They further agree the $95,000 tort settlement is an offset against underinsured motorist coverage. They part company, however, as to how the offset is to be taken.

Neuman owned three vehicles, all insured with State Farm, with underinsured motorist coverage (UIM) as follows:

| | |
|---|---|
| Vehicle No. 1 (the Ford pickup): | $50,000 per person, $100,000 per occurrence |
| Vehicle No. 2 (a Pontiac): | $100,000—$200,000 |
| Vehicle No. 3 (a Buick): | $50,000—$100,000 |

The parties agree that Neuman is entitled to the "difference in limits" UIM coverage in effect in 1985. Under this formula, if the $95,000 tort payment is subtracted from the $50,000 UIM coverage for Vehicle No. 1, the net UIM coverage is zero. The same is true for Vehicle No. 3 which also has only $50,000 UIM coverage. For Vehicle No. 2 the UIM coverage is $100,000,

and subtracting $95,000 leaves $5,000 UIM stacked coverage (zero plus zero plus $5,000) available for Neuman's claim. This is State Farm's position. Neuman, on the other hand, argues that the three UIM coverages must first be aggregated, giving a total coverage of $200,000, from which the $95,000 is then deducted, leaving $105,000 UIM coverage available.

We first look at the declarations page of State Farm's policy covering the Ford pickup. This shows Neuman had "W3" coverage, which the parties agree denotes stacked UIM coverage. For a $3.00 premium, Neuman had elected to purchase "W3" coverage when the policy on his Ford pickup came up for renewal on October 19, only 7 days prior to the accident.[2]

Before turning to the text of State Farm's policy, one other bit of background information is important. Prior to Neuman's renewal of his policy in October 1985, the state legislature had extensively revised underinsured motorist coverage effective October 1. Basic UIM coverage was no longer optional but required. Most importantly, the method of calculating coverage benefits was changed from "add-on" coverage to "difference in limits" or "limits less paid" coverage. Finally, while the 1985 amendments prohibited judicially imposed stacking of UIM benefits, insurance companies could voluntarily offer their own stacked coverage.[3]

In the body of State Farm's policy, under the heading "Coverage W3," the policy sets out the "limits less paid" calculation:

---

*State Farm Mutual Auto. Ins. Co.,* Minn.App. 1992, No. C1–91–1508 (order opinion filed March 23, 1992), *pet. for rev. granted* (Minn., April 29, 1992), and concluded that it was required to follow *Neuman.* A petition for further review has also been granted in *Marty.*

**2.** Neuman did not have "W3" stacked coverage on his other two vehicles, apparently because the policies on those two vehicles had not yet come up for renewal. This does not affect our stacking problem here because Neuman was driving the Ford pickup at the time of his accident.

**3.** *See* 1985 Minn.Laws, 1st Sp.Sess., ch. 10, § 68, codified at Minn.Stat. § 65B.49, subd. 3a(6) (1986). For a review of the somewhat troubled

history of underinsured motorist coverage under the Minnesota No–Fault Act, *see Broton v. Western Nat. Mut. Ins. Co.,* 428 N.W.2d 85 (Minn.1988), and *Neuman v. State Farm Auto. Ins. Co.,* 480 N.W.2d 133 (Minn.App.1992). Effective August 1, 1989, the calculation of UIM benefits came full circle with a return to an "add on" basis. 1989 Minn.Laws ch. 213, § 2; 1989 Minn.Laws ch. 356, § 20, codified at Minn. Stat. § 65B.49, subd. 4a (1990) ("[T]he maximum liability of an insurer is the amount of damages sustained but not recovered from the insurance policy of the driver or owner of any underinsured at fault vehicle.").

1. The amount of coverage is shown on the declarations page under 'Limits of Liability—W3—Each Person, Each Accident'. Under 'Each Person' is the amount of coverage for all damages due to bodily injury to one person. * * *

2. The most we will pay under this coverage will be the lesser of:
a. the difference between the limits of liability of this coverage and the amount paid to the insured by or for any person or organization who is or may be held legally liable for the bodily injury; or
b. * * *.

"The most we will pay under *this coverage* will be * * *." (Emphasis added.) State Farm argues that the term "this coverage" refers only to the liability limits in *this* policy. Thus, in a stacking situation, each policy would appear to provide its own separate coverage for the insured's claim. So, says State Farm, "W3" simply means that the policyholder can seek recovery under three policies, whereas a "W" designation would allow him to recover under only one policy. Consequently, concludes State Farm, the tort set-off is applied first to each policy to determine the available coverage under that policy, and then the available coverage, if any, is stacked.

Nowhere in the policy, however, is stacking explained, much less explained as State Farm would have it. Under the heading "W3" the policy simply sets out the "limits less paid" formula, which tracks the statutory formula of Minn.State § 65B.49, subd. 4a (1985) and which, significantly, is the same formula (although phrased differently) as used under the policy provision headed "W" to explain basic underinsured motorist coverage. Left unsaid is exactly what happens when the "coverage limits"

of several policies must be coordinated for stacking purposes.

It appears State Farm, in an attempt to comply with the 1985 amendments, sent its policyholders a premium notice stating that coverage "W" had been added to the policy "as required by law" and that "[i]f you want stacking coverage U3 and W3, pay an additional $___, or contact your agent now." Also, it appears policyholders received a policy endorsement which discusses "W" and "W3" coverages. (It is unclear from the record if Neuman received this booklet). This booklet explains, in pertinent part: "If you buy stacking coverage, it may be available in addition to other applicable coverage if that other coverage is not sufficient to pay covered damages." But this explanation of stacking, such as it is, is tantalizingly uninformative.[4]

It seems to us that when State Farm chose to use the code symbol "W3" in its policy to denote stacking, it was incumbent on the company to explain in the policy or in a policy endorsement what the code meant. The switch on October 1, 1985, to "limits less paid" UIM coverage gave fresh nuances to the policy terms "coverage," "coverage limits," and "limits of liability" that were not present under the pre–1985 "add-on" coverage, and which impact on stacking. To explain what we mean here, we must return to the history of UIM coverage under our No–Fault Act.

Prior to 1985, as previously mentioned, Minnesota employed an "add-on" method of computing the amount of UIM coverage available to an insured. The "add-on" method allowed an insured to collect tort damages from the tortfeasor, and then collect additional underinsured motorist benefits under his or her own policy's UIM limits of liability for whatever damages remained uncompensated. Thus, the amount of UIM coverage (as determined by

---

4. At the time of Neuman's renewal of his policy on the Ford pickup, the Commissioner of Insurance was ordering insurers to file a policy form providing for optional stacking. State Farm complied, but contested this order, and, subsequently, in *In the Matter of State Farm Mut. Auto. Ins. Co.*, 392 N.W.2d 558, 576 (Minn.App. 1986), and further in *Austin Mut. Ins. Co. v. Templin*, 435 N.W.2d 584, 587 (Minn.App.1989),

the court of appeals ruled that insurers could not be compelled to offer stacking but could provide stacking coverage on a voluntary basis as a supplementary benefit.

With stacking in a confusing state and with the method of computing UIM coverage having radically changed, it perhaps is not surprising that State Farm, in the fall of 1985, was somewhat tentative in drafting its policy form.

the limits of liability) was available to be added on to any amount the insured recovered from the tortfeasor, up to but not exceeding the total amount of damages the insured had sustained in the accident. Assume, for example, an insured who incurs $100,000 in damages, has a policy with $50,000 UIM limits of liability, and who recovers $50,000 from the tortfeasor. Under the add-on method, the insured would receive the full $50,000 UIM coverage available under his own policy in order to cover all his damages. *See Broton v. Western Nat. Mut. Ins. Co.*, 428 N.W.2d 85 (Minn.1988).

After October 1, 1985, Minnesota shifted to a "limits less paid" method of computing insurance liability. The "limits less paid" method requires that any amount recovered from the tortfeasor be deducted up front from the UIM limits of liability in the insured's policy. *See Broton, supra.* Thus, the most an insured could ever recover under this formula would be the total amount available under the UIM limits of liability of his own policy, regardless of whether or not his damages exceed that amount. In fact, insurers under this formula are generally liable for less than the purchased amount of UIM coverage because whatever is recovered from the tortfeasor automatically reduces the insurer's liability by that amount. In the hypothetical described in the preceding paragraph, the insured would recover nothing from his own company. This is because the $50,000 recovered from the tortfeasor would automatically be deducted from the insured's UIM limits of liability of $50,000, resulting in zero UIM liability.

Under the pre–1985 "add-on" method, Neuman, if he had stacked coverage on his three vehicles, would have had $200,000 in UIM coverage available to be added on to the $95,000 he recovered from the tortfeasor, up to the amount of damages he incurred. The $95,000 would not be offset against anything. Whatever amount Neuman needed to cover his damages above and beyond the $95,000 would come from his own insurance policy until he had exhausted its stacked liability of $200,000 or until his damages were paid, whichever came first.

It is clear enough how basic UIM coverage is to be calculated under the "limits less paid" formula. Less clear, however, is how this coverage is to be stacked when there is more than one policy involved. Stacking for "add-on" coverage was easy and needed no explanation; stacking under "limits less paid" coverage needs clarification. Arguably, the UIM limits of liability set out on the declaration pages of the three policies should first be added together, as was the understood practice with the prior "add-on" method, and then, as required by the new "limits less paid" method, the tort offset should be taken. This is Neuman's position. On the other hand, State Farm argues the "limits less paid" formula requires that the tort offset must first be taken from each policy coverage before anything is stacked.

Both methods of stacked liability are reasonable interpretations of how stacking might work after the 1985 legislation became effective. State Farm, however, never explained to Neuman or its other policyholders that it intended to use the seriatim deduction method, and Neuman can just as reasonably maintain that "limits less paid" means "stacked limits of $200,000 less paid." The double meaning here works in Neuman's favor, as policy ambiguities are to be construed in favor of the insured to afford coverage where the policy language is susceptible to two or more meanings. *Nordby v. Atlantic Mut. Ins. Co.*, 329 N.W.2d 820, 822 (Minn.1983). *See also Farmers Home Mut. Ins. Co. v. Lill*, 332 N.W.2d 635, 637 (Minn.1983) (ambiguities are to be construed against the drafter of the insurance policy).

Consequently, we hold that for stacking purposes in this case "W3" coverage is to be calculated by first aggregating the UIM limits set out on the declarations page of the three policies and then deducting the tort offset from the aggregate limits. Thus Neuman has available for his claim UIM coverage of $105,000.

Reversed.