**PIPER JAFFRAY COMPANIES, INC.; Piper Jaffray, Inc.; Piper Capital Management, Incorporated; and Piper Funds, Inc., Plaintiffs,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA; Reliance National Indemnity Company; and Executive Re Speciality Insurance Company, Defendants.**

**Civil No. 4–96–1143 JRT/RLE.**

United States District Court,
D. Minnesota,
Fourth Division.

June 18, 1997.

Robert P. Thavis, George F. McGunnigle, Jr., Steven P. Zabel, Leonard, Street & Deinard, Minneapolis, MN, for Plaintiffs.

Bradley M. Jones, Meagher & Geer, Minneapolis, MN, Jeff I. Ross, Zelle & Larson, Minneapolis, MN, Richard P. Mahoney, Mahoney, Dougherty & Mahoney, Minneapolis, MN, David W. Evans, Haight, Brown & Bonesteel, San Francisco, CA, Daniel J. Standish, Ross, Dixon & Masback, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

TUNHEIM, District Judge.

This declaratory judgment action arises out of a series of lawsuits brought against officers and directors of plaintiffs Piper Jaffray Companies, Inc., and its related subsidiaries (collectively, "Piper"). Through these many subsidiaries, Piper managed the investments of individuals and other entities. In the early 1990's, Piper suffered sharp reverses, resulting in numerous lawsuits brought principally by these investors. At all relevant times, the officers and directors of Piper were covered by a total of four policies issued by defendants National Union Fire Insurance Co., Reliance National Exchange Indemnity Co., Reliance Insurance Co.,[1] and Executive Re Specialty Insurance Co. (hereafter, "defendants" or "Insurers"). Two policies (covering different time periods) were issued by National Union; each of the remaining policies provides excess coverage to one of the primary policies. Because the excess policies "follow form" to the underlying policies, the parties agree that the coverage issues presented turn solely on the interpretation of the underlying policies. These underlying policies are identical with respect to the questions presented here.

While the nucleus of facts at the center of each of the thirty-six separate actions brought against Piper's officers is the same, there are key distinctions among them. The parties agree that twenty of these underlying actions involve "mutual funds." In addition, there are eleven actions involving "closed-end funds;" the parties dispute whether these closed-end funds are "mutual funds." Another underlying claim is a class action brought by Piper shareholders for the diminution in value of Piper stock (distinct from the declining values of shares in Piper-managed funds) allegedly caused by the poor performance of Piper's investment activities and management misrepresentations with regard to investments. Four more claims involve Piper's management of individual investors (i.e., those who do not pool their assets with others in a common fund).[2]

Many of the lawsuits against Piper's officers have either been settled or arbitrated to resolution. Piper asserts that it has paid and will continue to pay sums on the officers' behalf. Unlike most insurance policies, the National Union policy does not provide a duty to defend; the question here is whether the policy ultimately requires the Insurers to indemnify. While the policy initially grants coverage to Piper for reimbursement of such claims, there are three significant limitations to that coverage:

### ENDORSEMENT # 8

In consideration of the premium charged, it is hereby understood and agreed that the insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Insureds arising out of any of the following:

A. The offering or sale of mutual fund shares or variable annuities or interest in any real estate investment trust, or

---

1. Reliance Insurance Co. is not yet a party to this case, but it appears that the parties agree that it should be substituted for defendant Reliance National Indemnity Co., since the policy was furnished by Reliance Insurance Co. The parties are directed to stipulate to a substitution or explain why they have not, within ten days following this order.

2. Defendants incorrectly claim that plaintiffs concede that claims 28–31 (as set forth in defendants' exhibits) involve mutual funds. (Defs.' Reply Supp. Mot. Dis. at 3 n. 3.) In fact, plaintiffs clearly state that Claim 29 refers to a private account managed by Piper. (Pls.' Mem. Opp'n. Mot. Dis. at 16 n. 13.)

any diminution of assets in connection with such activities; or

   B.  The ownership or control or management of any mutual fund or real estate investment trust.

### ENDORSEMENT # 11

In consideration of the premium charged, it is hereby understood and agreed that the insurer shall not be liable to make any payment for Loss in connection with any claim or claims arising out of, based upon or attributable to the Company's or an Insured's performance of or failure to perform professional services for others for a fee, or any act, error, or omission relating thereto. Provided, however, that the forgoing exclusion shall not be applicable to any derivative or shareholder class action claims against Directors or Officers alleging a failure to supervise those who performed or failed to perform such professional services.

### ENDORSEMENT # 12

In consideration of the premium charged, it is hereby understood an agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers based upon or attributable to the Company's performance of professional services for others in the capacity of Investments Counselor, Mutual Fund Advisor and/or Underwriter/Broker Dealer.

Provided, however, that the forgoing exclusion shall not be applicable to any derivative or shareholder class action claims against Directors or Officers alleging a failure to supervise those who performed or failed to perform such professional services.

(Defs.' App. B Tab 1.)

Relying on these exclusions, the Insurers refused to indemnify Piper. Piper subsequently filed this declaratory judgment ac-

tion; the Insurers have rejoined with the present motion to dismiss for failure to state a claim. For the reasons states herein, the motion is granted in part and denied in part.

## I.  STANDARD OF REVIEW

■  The standard for dismissal under Fed.R.Civ.P. 12(b)(6) is exacting: the pleadings are construed in the light most favorable to the plaintiff, and its allegations taken as true. *Vizenor v. Babbitt,* 927 F.Supp. 1193, 1197 (D.Minn.1996). Moreover, dismissal is permitted only where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quoting *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982)).

■  As is increasingly common, defendants have submitted voluminous extra-pleading material to support their motion. This is an unfortunate trend; the Court simply may not at this stage resolve factual disputes on the basis of preemptive (and untested) submissions. Moreover, the need for discovery, as set forth below, precludes the Court from converting this motion for dismissal into one for summary judgment. Therefore, the Court must resist the temptation to peer into Piper's website,[3] compare Wall Street Journal listings of fund prices or otherwise consider matter not contemplated by the pleadings. However, the Court *may* consider extra-pleading material necessarily embraced by the pleadings, such as copies of the underlying complaints, the policies themselves, and all documents they incorporate by reference. *Vizenor,* 927 F.Supp. at 1198.[4] With the scope of the inquiry in mind, we turn to the merits.

## II.  WHAT IS A MUTUAL FUND?

Underlying much of the parties' sparring rests this deceptively simple-looking question. Endorsement # 8 precludes coverage for losses attributable to Piper's "mutual fund" activities. Scanning the underlying

---

**3.**  The Court understands that Piper's website has changed in response to this litigation; the Court fully expects Piper to cause all relevant previous "editions" to be preserved for discovery.

**4.**  This set of permissible documents does not include the Insurers' "Summary of Underlying Claims," which, helpful as it may otherwise be, summarizes some of the very "facts" the parties dispute.

complaints, the Insurers seize upon the term "mutual fund" and invoke the exclusion to deny coverage. Piper in turn points to the failure of the policy to specify the meaning of the term "mutual fund." From this, Piper argues first that some of the products sold to its customers were, as a matter of law, *not* mutual funds. Alternatively, Piper argues that the term is ambiguous, and quickly concludes—without pausing to consider extrinsic evidence—that it must win under the rule that ambiguities are construed against the insurer. *See Neuman v. State Farm Mut. Auto. Ins. Co.,* 492 N.W.2d 530, 533 (Minn. 1992). Piper's first argument is wrong; its second is premature.

## A. An Open and Closed Case?

Mutual funds have exploded in popularity in recent years, a fact which issuers such as Piper have capitalized upon to grow their assets. As this litigation has revealed, there are two distinct products which might be described as mutual funds. The first is an "open-end" or "open" fund. An open fund, after issuing shares, stands ready to redeem them. Thus, while investors may (and here, did) lose money due to the diminution in share value, there is always a willing buyer. "Closed-end" or "closed" funds operate more like corporations offering stock. Once a share is issued to an investor, it trades freely on the stock exchange, and the issuer has no obligation to redeem it. Piper offered both types of funds to investors.

The Court first considers those eleven underlying suits in which only closed fund shares were purchased. Piper argues that closed funds are not mutual funds, pointing to federal laws and regulations which it alleges distinguish the two. However, these rules are but slender reeds which do not support the outcome-determinative weight Piper seeks to rest upon them.

15 U.S.C. § 80a–5(a) states that for purposes of that subchapter

> management companies are divided into open-end and closed-end companies, defined as follows: (1) 'open-end company' means a management company which is offering for sale or has outstanding any redeemable security of which it is the is-

suer. (2) 'Closed-end company' means any management company other than an open-end company.

The Federal Reserve Board of Governors has promulgated regulations relating to the operations of bank holding companies. 12 C.F.R. § 225.125(c) permits such companies to

> act as investment advisers to various types of investment companies, such as 'open-end' investment companies (commonly referred to as 'mutual funds') and 'closed-end' investment companies. Briefly, a mutual fund is an investment fund which, *typically,* is engaged in the issuance of its shares and stands ready at any time to redeem the securities as to which it is the issuer; a closed-end investment company typically does not issue shares after its initial organization except at infrequent intervals, and does not stand ready to redeem its shares.

(Emphasis added.) The regulation further specifies that while bank holding companies are forbidden from organizing or controlling "mutual funds," this restriction does not apply to "closed-end investment companies." *Id.*

Read together, statute and regulation suggest that if a fund is a closed one, it is not a mutual fund. However true this may be with respect to the regulatory distinction between permitted and forbidden banking activities, this does not decisively establish the meaning of the term "mutual fund" within the policies at issue here. First, as far as the Court can tell, this regulation has nothing to do with the claims pressed against Piper. While the underlying complaints are suffused with charges of misrepresentation and malfeasance, no one appears to claim that Piper inappropriately controlled open funds, when it was limited by regulation to closed funds. Second, the definition of "mutual fund," is materially qualified by the word "typically." Perhaps mutual funds "typically" stand ready to redeem their shares. But this does not mean that a fund which did not was not "mutual;" it simply means that it is not "open." Thus, a closed fund might nonetheless be "mutual," in that regardless of the alienability of particular shares, all share-

holders are joined in a common fate—the value of the shares as determined by the fund's investment prowess.

There are other reasons to view Piper's claim with suspicion. These are not the only federal regulations offering clues about the meaning of these terms. 5 C.F.R. § 2634.1003 describes limits on the ownership interests of government personnel. It defines a "diversified investment fund" as "any open-end mutual fund" which does not limit its investments to particular sectors. If Piper is correct about the all-encompassing nature of the definition hinted at in 12 C.F.R. § 225.125(c), this phrasing is redundant, as all (and only) open-end funds would be mutual funds. Continuing, the regulation provides an example of a hypothetical "Omega Fund." It describes this fund as "a closed-end *mutual fund* which is listed on the New York Stock Exchange." (Emphasis added.) A related regulation which states: "Mutual fund means an entity which is registered as a management company under the Investment Company Act of 1940, as amended (15 U.S.C. § 80a-1, *et seq.*). For purposes of this part, the term mutual fund includes open-end and closed-end mutual funds ..." 5 C.F.R. § 2640.102(k). Apparently, the Office of Government Ethics thinks that a fund need not be closed in order to qualify as "mutual." So too with many of the underlying complainants; some complaints are sprinkled with references to "closed-end mutual funds," while others, *referring to closed funds*, nevertheless describe them as "mutual funds."

### B.  Maybe It's a Mutual Fund

■  While the Court rejects Piper's argument that closed funds are "by law" distinct from mutual funds, the burden in this 12(b)(6) proceeding is obviously on the defendants to show that as matter of law, they are the same. With that in mind, Piper alternatively argues that the term "mutual fund" is ambiguous, and should be construed against the Insurers in favor of coverage. At this early stage, in view of the two types of funds, the undefined term "mutual fund" is indeed ambiguous. However, Minnesota courts have been quite clear that the initial existence of a contractual ambiguity does not

"ineluctably lead to the conclusion that the drafter is to lose." *Davis by Davis v. Outboard Marine Corp.,* 415 N.W.2d 719, 724 (Minn.Ct.App.1987) (quoting *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 67 (Minn.1979)).

In construing contracts, including contracts of insurance, the task "is to determine and give effect to the intent of the parties to the contract." *Davis,* 415 N.W.2d at 723. The Court must look both to the circumstances surrounding the making of the contract and the parties' own subsequent interpretations of its terms. *Id.* at at 723–24. Moreover, "insurance contracts and policies are assumed to have been made with reference to trade usages and customs of the place where business is transacted. In the absence of express terms of the contract ... they can form part of the contract." *Quinlivan v. EMCASCO Ins. Co.,* 414 N.W.2d 494, 497 (Minn.Ct.App.1987).

■  Here, it is the lack of an express definition of the term "mutual fund" which is the problem. Consideration of extrinsic evidence may yield a clear answer as to the parties' understanding of the exclusion, and specifically, whether Piper's construction is indeed "reasonable" in view of accepted customs and usages. Such evidence may include Piper's advertising, and its representations to other insurers and regulatory bodies. *See W.S.A., Inc. v. Liberty Mut. Ins. Co.,* 7 F.3d 788, 792 (8th Cir.1993) (insured could not claim that its use of the term "joint venture" to describe undertaking was irrelevant when faced with exclusion barring coverage for "joint ventures"). Evidence of the Insurers' understanding and use of the term also may shed light on the construction problem presented here. Finally, decisional law, statutes, and regulations, while not conclusive here, are instructive. *See, e.g., Turner,* 276 N.W.2d at 67 (looking to *Erie* decision to interpret unspecified reference to "State Laws" in contract). While defendant proffers tantalizing evidence for which Piper may have to devise some more persuasive explanation than has heretofore been the case, only with the benefit of a complete record

can the Court resolve this question.[5] Thus, it is premature to dismiss this action or otherwise declare the rights of the parties with respect to closed-end funds.

### C. So What if It Is a Mutual Fund?

■ The battle moves next to those twenty claims which the parties agree involve mutual funds. In the face of Endorsement # 8, Piper asserts that coverage survives here because the claims involve the diminution of assets arising from Piper's ownership or control or management, rather than the "offering or sale" of mutual fund shares. Piper notes that Subpart A specifically excludes coverage for diminution in connection with the offering or sale of shares. It then points out that Subpart B generally excludes coverage for claims arising out of the ownership, control or management of a mutual fund. From this, it concludes that claims involving diminution arising out of ownership, control or management are not excluded.

■ Piper's argument is untenable. The exclusion clearly denies coverage to *any* claim arising out of the ownership or control or management of mutual funds. While the policy's bifurcation of Endorsement # 8 renders it somewhat inartfully drawn, no reasonable insured could possibly read it to understand that coverage existed for claims such as the underlying mutual fund lawsuits. Subparts A & B are not "irreconcilably inconsistent," so as to require the Court to find them ambiguous and strictly construe them against the Insurers. *Rusthoven v. Commercial Standard Ins. Co.*, 387 N.W.2d 642, 644–45 (Minn.1986). Moreover, Piper

ignores the Minnesota Supreme Court's consistent admonition that the Court may not construe ambiguous terms "beyond the reasonable expectations of the insured." *Id.* at 645. The Court finds that the clause unambiguously precludes coverage for the underlying claims to the extent they are premised on the diminution of mutual fund share values arising from Piper's ownership, management or control of such funds.

Relatedly, Piper further argues that Endorsement # 8 conflicts with Endorsements # 11 and # 12. These Endorsements exclude the provision of "professional services" from coverage, with an exception for certain class actions, as discussed below. Again, Piper is incorrect. Unlike the situation in *Rusthoven*, where a policy separately enumerated two incompatible methods for calculating the amount of "stacked" coverage, no reasonable insured could read any of the Endorsements here in favor of coverage. Piper's best shot here is Endorsement # 12, which excludes coverage for professional services rendered in various capacities, including "Mutual Fund Advisor." At first, this seems redundant. However, Endorsement # 8 effectively precludes coverage for activities such as "Mutual Fund Offeror," "Mutual Fund Seller," "Mutual Fund Manager," "Mutual Fund Owner," and "Mutual Fund Controller." Thus, even if Endorsement # 12 effected a *grant* of coverage (which it does not), the only reasonable interpretation would be that the grant at most applies where Piper provides advice regarding mutual funds that Piper neither owns, manages, controls, or has offered or sold.[6] Conceded-

---

5. Actually, both parties have some explaining to do. For example, the Insurers note Piper's apparently frequent use of the term "closed-end mutual funds," pointing to Piper's 1994 10–K form, where Piper makes such a reference. (Ross Aff. Tab 3 at 12189). Read in its entirety, however, the document provides less support for the Insurers than they think. Under the heading, "Item 1. Business" appears the following statement: "Piper Capital is also the investment adviser to *22 closed-end funds*, the Piper Funds, Inc. series of 12 *open-end mutual funds*, the Piper Institutional Funds, Inc. series of three open-end funds, and the Piper Global Funds, Inc., which currently has one global open-end fund." (Ross Aff. Tab 3 at 12168.) (Emphasis added.) After appropriate discovery, the Insurers will have to

explain why, if—as they argue—the 10–K should be considered by the Court in construing the policy, this clear distinction between closed-end funds and mutual funds should not weigh against them.

6. A possible exception to this would be a recommendation by Piper to purchase a Piper-owned "fund" which was totally fraudulent or non-existent. No such allegations exist here. Moreover, it is worth repeating that this clause effects an *exclusion* from coverage; *at a minimum*, it excludes coverage for advice regarding non-Piper funds. Together with the exclusion contained in Endorsement # 8, it is difficult to imagine any claim arising out of mutual fund activity that could be covered.

ly, given the vast number of home-grown instruments at its disposal, Piper may not often have provided such advice. Plainly, however, such advice is not at issue here. Rather, as Piper concedes, the mutual funds claims arise out of its ownership, management or control of the mutual funds. Therefore, there is no coverage for these claims.

## III. PROFESSIONAL SERVICES EXCLUSIONS

■ The Insurers renew their attack on coverage for all claims that potentially are not already excluded by Endorsement # 8. The Insurers argue coverage is precluded by the "professional services" exclusion contained in Endorsements # 11 and # 12. If Piper's activities on behalf of its investors constitute "professional services," and are not saved by the class action exception, Piper will be denied coverage for closed-end fund losses, regardless of their mutual or non-mutual character.

### A. Ministerial Acts

■ Piper defends on several grounds. First, it argues that the complaints simply do not arise out of "professional services" at all, but rather involve unexcluded "business activities." Piper bases this on the fact that the underlying complaints also charge Piper with deficient accounting procedures and inadequate or false reporting. These activities, Piper maintains, are "business activities," not professional services. This argument is unconvincing. While the underlying complaints are scattered with such references, the claims asserted unmistakably arise from the provision of investment services. A "professional service," within the meaning of an insurance exclusion, "is one calling for specialized skill and knowledge in an occupation ... [t]he skill required to perform a professional service is predominantly intellectual or mental rather than physical." *Ministers*

*Life v. St. Paul Fire & Marine Ins. Co.*, 483 N.W.2d 88, 91 (Minn.Ct.App.1992).

Piper apparently seeks refuge in the "ministerial act" exception to the scope of "professional services." *Purely* ministerial acts requiring no expertise fall without the scope of professional services. *Alpha Therapeutic Corp. v. St. Paul Fire & Marine Ins. Co.*, 890 F.2d 368, 370 n. 6 (11th Cir.1989). The Court has serious doubts regarding Piper's contention—unsupported by a shred of relevant case law—that a failure to follow accounting procedures does not constitute a professional service. Accountancy, by definition, is a profession. Likewise, the attorneys whom Piper likely engaged to prepare its SEC reports would doubtless be astounded to learn that they had not been providing "professional services."

More importantly, the claims of the underlying plaintiffs are "not premised on the ministerial act" of failing to follow clerical procedures. *See Ministers Life*, 483 N.W.2d at 91. Rather, they arise from Piper's alleged failure prudently to manage the assets of its investors, often—it is alleged—in derogation of explicit instructions. Managing investments requires specialized skills and effort which are almost exclusively intellectual. These clearly involve professional services excluded by the policy.[7] This exclusion denies coverage to all the underlying claims, with the exception of *McDaid*, unless coverage is restored through the exception for certain class actions.

### B. Class Actions

Piper next argues that coverage is saved by the exception in Endorsements # 11 and # 12 for "derivative or shareholder class actions against Directors or Officers alleging a failure to supervise those who performed or failed to perform such professional services." Initially, the Court notes that in making this argument, Piper has trouble putting aside its

---

7. *See also St. Paul Fire & Marine Ins. Co. v. Jacobson,* 48 F.3d 778, 782 (4th Cir.1995) (fact that infertility physician fraudulently used his own sperm to inseminate patients did not preclude coverage under policy limited to "professional services;" basis of malpractice claims not the "mere production" of sperm, but the application of insured's special learning and technical

skill); *Alpha Therapeutic Corp. v. St. Paul Fire & Marine Ins. Co.,* 890 F.2d 368, 370–71 (11th Cir.1989) (medical technician's inadvertent transposition of figures relating to blood testing was interwoven with blood testing process, and like such testing, constituted a "professional service").

previous contention that professional services are not involved: "The claims against the directors and officers are essentially failure to supervise claims; [the] claims are not based on allegations that defendant directors and officers performed anything remotely like a 'professional service.'" (Pls.' Mem. Opp'n. Dis. at 21.) The Court doubts that Piper really means this. For if the claims are not for professional services, than Endorsements #11 and #12—*including the class action exception on which Piper relies here*—do not apply. Since the acts complained of do constitute professional services, the Court must consider whether the exception applies.

The first requirement of the exception is that the actions be "derivative or shareholder" class actions. The *PJIGX, Gordon, Hosea, Fleck* and *Christian Fellowship*[8] lawsuits are all class actions. However, coverage for the *PJIGX, Hosea* and *Fleck* claims is already precluded by Endorsement #8, to the extent they involve mutual fund claims. Thus, the issue is whether coverage exists for the *Gordon* and *Christian Fellowship* class actions.

### C. "Failure to Supervise"

■ As noted, Piper argues that the claims against its officers and directors are in fact "failure to supervise" claims. The Insurers correspondingly deny that they arise from a failure to supervise employees. Neither party pauses to specify what is meant by that phrase—i.e., what cause of action falls within the exception. One initially plausible candidate is the tort of "negligent supervision." However, Minnesota courts have made clear that this tort may not be predicated upon economic loss. Rather, the doctrine, which is expressed in Restatement (Second) of Torts § 317 and Restatement (Second) of Agency § 213, is "unambiguously limit[ed]" to situations involving the threat of personal injury. *Bruchas v. Preventive Care, Inc.,* 553 N.W.2d 440, 443 (Minn.Ct. App.1996); *Semrad v. Edina Realty,* 493 N.W.2d 528, 534 (Minn.1992) (§ 317 has no application to cases involving economic loss only); *accord, Mandy v. Minnesota Mining*

*& Mfg.,* 940 F.Supp. 1463, 1472 (D.Minn. 1996); *Bruchas,* 553 N.W.2d at 443 (§ 213 liability arises solely from threat of physical injury).

■ The underlying claims are predicated upon the economic losses suffered by investor classes. If "failure to supervise" in the policies simply means the common-law tort of negligent supervision then there is no coverage. Since shareholder actions are quintessentially economic loss claims, there would under this view *never* be coverage. The Court doubts the parties intended this rather specific exclusion to be a practical nullity. Under the doctrine of illusory coverage, such a construction is disfavored in Minnesota, for "liability insurance contracts should, if possible, be construed so as not to be a delusion to the insured." *Jostens v. Northfield Ins. Co.,* 527 N.W.2d 116, 118 (Minn.Ct.App.1995). Moreover, since the tort of negligent supervision, appears to be directed at *employers,* (which the officers and directors are not), this provides another reason for looking elsewhere.

To determine whether a claim is covered, the Court must compare the allegations in the complaint with the relevant language contained in the policy. *Ross v. Briggs & Morgan,* 540 N.W.2d 843, 847 (Minn.1995). In the context of an insurer's duty to defend, the duty is established if there exists "a semantic connection between the policy's enumerated offenses and the claims made in the underlying case." *Id.* at 848. Several courts from other jurisdictions have considered how to construe policy language which, if read literally, refers only to specific claims. In *Granite State Ins. Co. v. Aamco Transmissions, Inc.,* 57 F.3d 316, 319 (3d Cir. 1995), the Third Circuit rejected the insurer's position that "the phrase 'unfair competition' unambiguously refers only to the traditional common law tort of that name." The court reasoned that both the Pennsylvania legislature and its supreme court have denominated as "unfair competition" several forms of conduct which do not fall within the narrow, traditional meaning of the term. *Id.* Moreover, an insured reading the policy "would

**8.** The *McDaid* shareholder complaint is also a class action. It is discussed *infra.*

not necessarily understand the term to be limited to a common-law definition." *Id.*

Courts have split over the degree of liberality given to defining the parameters of causes of action specified "by name" in insurance policies. *See, e.g., Scottish Guarantee Ins. Co., Ltd. v. Dwyer,* 19 F.3d 307, 311–12 (7th Cir.1994) (coverage for "wrongful entry" under policy included toxic chemical see page onto adjoining property; see page constituted a form of the analogous tort of "negligent trespass"); *but see St. Paul Fire & Marine v. Advanced Interventional Systems, Inc.,* 824 F.Supp. 583, 585 (E.D.Va.1993) (coverage for misappropriation of a "style of doing business" did not include claim that insured had infringed competitor's patent involving a single device; claim did not approach "pervasive similarity in the overall manner of doing business" required to sustain misappropriation claim); *Martin v. Brunzelle,* 699 F.Supp. 167, 170 (N.D.Ill.1988) (provision extending coverage for "wrongful entry or eviction or other invasion of the right of private occupancy" did not include claim that landlord wrongfully refused to rent to prospective tenant on the basis of race). Each case, it appears, turns on its particular facts.

██ In Minnesota, a corporate officer can be liable for the torts of the corporation's employees only if the officer participates in, directs or was negligent in failing to learn of and prevent the tort. *Morgan v. Eaton's Dude Ranch,* 307 Minn. 280, 239 N.W.2d 761, 763 (1976). Thus, liability may be predicated solely upon supervisory functions, and it does not appear to be limited to cases of physical injury. *See Nordling v. Northern States Power Co.,* 478 N.W.2d 498, 505 (Minn.1991) (corporate officer may be liable for maliciously interfering with employment contract by "causing" employee's termination).

██ Reliance on *Nordling* raises another impediment, however. With respect to contract actions, and tort actions founded on contract, corporate officers do not have personal liability unless they act outside the scope of their employment. *Jones v. District VIII Planning Council,* 492 F.Supp. 143, 146 (D.Minn.1980); *Nordling,* 478 N.W.2d at 505 ("[i]f a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort"). There is some tension between the broad sweep of *Morgan,* which continues to be good law, *see Norwest Capital Management & Trust Co. v. United States,* 828 F.2d 1330, 1344 n. 11 (8th Cir. 1987); *In Re Dougherty,* 482 N.W.2d 485, 488 (Minn.Ct.App.1992) and *Nordling's* express requirement that the conduct be *ultra vires.* The Court notes that *Nordling* has only been applied in cases involving tortious interference with an employment contract. *See, e.g., Carter v. Peace Officers Standards & Training Bd.,* 558 N.W.2d 267, 273 (Minn. Ct.App.1997); *Piekarski v. Home Owners Savings Bank,* 956 F.2d 1484, 1495 (8th Cir. 1992); *Petroskey v. Lommen, Nelson, Cole & Stageberg,* 847 F.Supp. 1437, 1449 (D.Minn. 1994). Accordingly, *Nordling's* limitation is inapplicable here, and the Court concludes that a corporate officer is responsible for the torts of employees in which he participates, directs, or negligently fails to prevent.

██ With this in mind, the Court is skeptical that the underlying complaints are alleging this sort of activity. Specifically, there is little textual support for Piper's "failure to supervise" view in the complaints themselves; nowhere are Piper's officers and directors charged with inadequate supervision of employees. Instead, the complaints are replete with specific allegations of the officers' own misconduct. However, the Court cannot say for certain that none of the claims fall within the scope of the corporate officer liability recognized under Minnesota law. The facts alleged in the complaints do not preclude the possibility that some officers may have negligently failed to prevent torts allegedly committed by less senior officers or other employees. Giving Piper the benefit of every ounce of doubt the Court can muster under Fed.R.Civ.P. 12(b)(6), the Court declines to hold, absent further information about the conduct giving rise to the underlying claims, that Piper cannot satisfy the class action/failure to supervise exception to the professional services exclusions. Of course, the burden will fall to Piper to demonstrate

on a full record that its losses are in fact attributable to *supervisory* lapses, which is the only conduct excepted from the exclusions. *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn.1995).

## IV.  PRIVATE ACCOUNTS

Piper does not specifically answer the Insurers' claim that each of the four private investment claims also are barred by the "professional services" exclusions.  The Court examines each in turn.

The *Burwell* claim involves an allegation that Piper advised Mr. Burwell to purchase a note issued by Bayerische Vereinsbank.  Burwell alleges substantial losses owing to the fact that the investment vehicle was composed of "derivatives."  Coverage for this claim is barred by Endorsement # 12.

The *Kennedy* claim involves an allegation that Piper engaged in "churning" with respect to Mr. Kennedy's investments resulting in tax and investment losses, and excessive commissions.  Coverage is barred by Endorsements # 11 and # 12.

The *Nalen* claim involves an allegation that Mr. Nalen entrusted the management of his retirement fund to Piper, which improvidently selected "derivative" instruments for investment.  Coverage is barred by Endorsement # 12.

The *University of Minnesota/Ruminco* also alleges that funds were entrusted to Piper, with results similar to those described above.  This claim also specifies investments in Piper-owned mutual funds.  Coverage is therefore barred by Endorsements # 8, # 11, and # 12.

## V.  *McDAID*

### A.  Mutual Fund Losses

This is an action brought by the shareholders of Piper—a class distinct from the participants in Piper-related funds.  The shareholders allege that as a result of the conduct giving rise to the *investors'* underlying claims, and Piper's misrepresentations to the (stock-market) investing public, they suffered substantial losses from the purchase of Piper shares.  The Insurers attribute these losses to Piper's mutual fund activities, and argue that coverage is excluded by Endorsement # 8.  The Court disagrees.

Under Minnesota law, an insured need only show that a covered cause is but one of the causes of loss.  *SCSC*, 536 N.W.2d at 314.  Where a loss arises from several causes, it is untrue, contrary to the Insurers' suggestion that the insurer need only show that an excluded risk was a "substantial" cause of the loss.  Instead, the burden rests with the insurer to show that an uncovered risk was the "overriding" cause to the exclusion of the covered risks.  *Id.*

The Court is well aware that the question for today is whether coverage in fact exists.  However, since the question arises in a Fed.R.Civ.P. 12(b)(6) proceeding, the Court's inquiry is informed by the law governing analysis of an insurer's "duty to defend."  That duty exists where covered claims are "arguably" within the scope of the policy.  *Ross v. Briggs & Morgan*, 540 N.W.2d 843, 847 (Minn.1995).  If a literal comparison of the complaint with the policy provisions indicates that there is no coverage, *but* the insured comes forward with, or the insurer is independently aware of, information suggesting coverage, the duty attaches. *SCSC*, 536 N.W.2d at 316.  The Court believes that this rule is designed to ensure that under conditions of uncertainty, the insured receives the benefit of the insurance contract for which he has paid.  In the context of a motion to dismiss, the Court must likewise resolve all disputed questions in favor of coverage.

The Court has already determined that the scope of the mutual fund exclusion is presently unclear.  Possibly, closed-end funds are not included within its ambit.  Together with Endorsements 11 and # 12, and their class action exceptions, coverage may yet exist for the *Gordon* and *Christian Fellowship* closed-end fund class actions.  While many of the losses suffered by Piper appear to be related to mutual fund activities, the complaint in *McDaid* makes clear that Piper's non-mutual fund activities are also at issue.  (*See McDaid* Compl., attached as Ex. 19 to Defs.'

App. A, referring to losses "extending to other mutual funds or managed funds . . . as well as private accounts for individuals an institutions whose average investments were $20 million."). These are likely to be discrete losses. That is, it should be ascertainable what portion of loss is attributable to which activity. In this Fed.R.Civ.P. 12(b)(6) proceeding, the Insurers' burden is exacting: they must demonstrate Piper could prove no set of facts consistent with the allegation which establish coverage. Although the *McDaid* claim does not directly refer to closed-end funds losses, it clearly encompasses claims for the effects of such losses—together with Piper's misrepresentations—on the shareholder's losses. Because these losses may be covered, it would be inappropriate to dismiss this action at the pre-discovery stage.

### B. Whether *McDaid* Arises Out of Investment Activities

▮ Moreover, a more basic question persists: whether the *McDaid* losses "arise out of" excluded activity *at all?* In other words, are the losses sustained by Piper's shareholders sufficiently linked to either Piper's ill-fated mutual fund activities or its professional services to others so as to "arise" from them, and therefore be excluded from coverage by the Endorsements? While this is a close question, the Court answers it in the negative.

The term "arising out of" has been often construed, yet has no precise meaning. This does not render it ambiguous, but explains why the Minnesota Supreme Court has acknowledged that "each case presenting such a question must, to a great degree, turn on the particular facts presented." *Rausch v. Beech Aircraft*, 277 N.W.2d 645, 647 (Minn. 1979) (quoting *Associated Indep. Dealers, Inc. v. Mut. Serv. Ins. Cos.*, 304 Minn. 179, 229 N.W.2d 516, 518 (1975)). Under *Rausch*, the term means "originating from," "growing out of," "having its origin in," or "flowing from." *Id.* Of course, these terms likewise do not yield answers through mechanical application to particular facts.

*Rausch* involved an exclusion barring coverage for, roughly arising out of the use of an airplane. The insured leased the plane to another, and expressly agreed to defend him against litigation. After a crash resulting in litigation against the lessee, the lessee sued the insured, and sought to collect the costs of defense from the insurer. The Minnesota Supreme Court rejected the lessee's argument that the exclusion was inapplicable because the liability for defense costs "really" arose from the contract, not the plane crash. After noting the impossibility of a precise standard, the Court described the crash as not simply "one among the myriad of incidental causes but for which any given result would not have come about." *Id.* at 647. Rather, "it is the original activity from which this entire matter arose. Far from incidental, it is fundamental to all that followed." *Id.* From this, the Court concluded that coverage was barred by the exclusion.

The parties recognize the importance of *Rausch* to the question at hand, and offer competing interpretations of its meaning here. The Insurers argue that the investment losses were a substantial cause of the facts underlying *McDaid,* and that *Rausch* eschewed strict "proximate causation" in favor of "but for causation." Because the *McDaid* action would not have arisen "but for" these, the Insurers conclude that it is barred.

It is clear that proximate causation is not required for a loss to "arise out of" some specified event or instrumentality. *Rausch,* 277 N.W.2d at 647; *Faber v. Roelofs,* 311 Minn. 428, 250 N.W.2d 817, 822 (1977). While the Court in *Faber* specified that simple "but for" causation was enough, the *Rausch* opinion suggests that something a little more than that (but clearly less than proximate cause) is necessary. *Compare Faber,* 250 N.W.2d at 822 *with Rausch,* 277 N.W.2d at 647. This analysis of *Rausch* is consistent with the line of cases, acknowledged with approval in *Rausch,* holding that where an excluded risk was "a mere instrument, receptacle or situs" of the acts giving rise to liability, the causal nexus is lacking. *Rausch* at 647 (quoting *Engeldinger v. State Automobile & Cas. Underwriters,* 306 Minn. 202, 236 N.W.2d 596, 600 (1975)).

Examination of the complaint in *McDaid* makes clear that the basis of the shareholders' claims, as is generally true with such actions, lies in the misrepresentations allegedly made by Piper's officers and directors to *them*. The *McDaid* plaintiffs' claim arises solely from the artificial inflation of the market price of Piper shares. While the shareholders obviously view with disfavor Piper's substantive investment choices, they cannot recover (nor have they attempted to plead a basis for recovering) simply because Piper lost money. Rather, Count I of the complaint recites the grounds for relief under 17 C.F.R. § 240.10b–5. To prevail, the *McDaid* plaintiffs must establish: (1) that Piper employed a device, scheme, or artifice to defraud, engaged in acts that operate as a fraud or deceit; or made representations or omissions of material fact (2) with scienter, that is, with intent to deceive, manipulate or defraud; (3) in connection with the purchase and sale of a security; and (4) Piper's acts caused the plaintiffs' damages. *Jones v. Zeos Ltd.*, 1993 U.S. Dist. LEXIS 15689, at *12 (D.Minn. Apr. 5, 1993).

No doubt, the *McDaid* plaintiffs will present evidence concerning *why* Piper's statements or omissions to the market regarding its prospects were misleading. Much of this evidence may involve the newly-appreciated risks of derivatives-based investment strategies. Sometimes these risks materialized in the diminution of mutual fund share values; other times, the losses were felt by individual investors. The shareholders of Piper were not injured by these events. Their injuries flowed instead from the drop in Piper's stock value in the securities market—a decline which allegedly would not have occurred if Piper had been honest about its investment strategies, *whatever they were*. The specific activities through which the misrepresented risks materialized were fortuitous, a fact which Minnesota courts have consistently held to be fatal to a claim that a loss "arose out of" a specified cause. Here, the specific investment activities excluded under the policy constitute "a mere instrument, receptacle

or situs of the primary [malfeasance] of the insured." *Rausch*, 277 N.W.2d at 647. That malfeasance lies primarily with Piper's alleged misrepresentations to the market, not its actual investment activities.

This analysis is consistent also with Minnesota's "actual injury" rule governing when there is an "occurrence." As the Eighth Circuit has recently noted, "the time of the occurrence is not the time the wrongful act was committed but the time the complaining party was actually damaged." *Fireman's Fund Ins. Co. v. Hartford Ins. Co.*, 73 F.3d 811, 815 (8th Cir.1996) (quoting *Singsaas v. Diederich*, 307 Minn. 153, 238 N.W.2d 878, 880 (1976)). While the issue before the court is the causal, rather than temporal link between events, this rule indicates that a focus on the injury to the *McDaid* classmembers is not misplaced. Because Piper's investment reverses did not actually injure the *McDaid* shareholders, the Court must look elsewhere for the origin of their claims. That origin lies in Piper's alleged misrepresentations to the securities market, for under the well-recognized principles of law governing securities fraud, "[t]o the extent that the defendants' misrepresentations artificially inflated the stock and defrauded the market, [transaction] causation is presumed." *In Re Control Data Corp. Securities Litigation*, 933 F.2d 616, 619–620 (8th Cir.1991) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988)). Because the *McDaid* losses arose out of these misrepresentations, the Insurers may not rely on the mutual fund activity or "professional services" exclusions to bar coverage.[9]

To summarize: No coverage exists for claims arising out of Piper's mutual fund activities. Coverage may exist for closed fund *class action* claims, depending on (a) the meaning of the term "mutual fund," and (b) the causal connection between the alleged injuries and the participation or direction by Piper's officers and directors in torts committed by others (including other officers) or the

---

9. One might make a similar argument regarding those underlying claims by investors which are essentially pled as securities fraud actions. However, because such claims are more closely

identified with specific investing activity—rather than the more generalized failures at the heart of *McDaid*—the Court finds that these claims do arise out of investing activities.

failure to prevent same. Final disposition of these matters remains for post-discovery proceedings. Finally, the *McDaid* action does not arise out of activity excluded by the Endorsements, and falls within the policy's initial grant of coverage.[10]

### ORDER

Accordingly, based on the above and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for dismissal [Docket No. 25] is **GRANTED IN PART**, as follows:

    a. Defendants owe plaintiffs no duty to indemnify losses respecting non-class claims arising from open or closed fund activities;

    b. Defendants owe plaintiffs no duty to indemnify losses respecting individual investor account activities;

In all other respects, defendants' motion is **DENIED**.

2. Defendants owe plaintiffs a duty to indemnify losses respecting the *McDaid* class action.

---

**10.** The Court rejects Piper's astounding contention that it did not provide services for a fee. In support of its position that it was instead selling "products" (fund shares), Piper cites the *Gordon* and *Christian Fellowship* complaints. Both of these complaints, however, allege that Piper and its officers received substantial fees for trading the shares on behalf of the investors. *Gordon* § 117 (reciting fees in excess of *$20 million*); *Christian Fellowship*, §§ 89, 295. The Court also rejects Piper's argument that no such services were performed "for others," because certain services were performed by Piper entities for other entities. Whatever internal arrangements existed, the "entity" that is Piper Jaffray and its officers clearly performed services for its investors.