**In re Robert L. FIELDS and Patricia S. Fields, Debtors.**

**Community Finance Group, Inc., a Minnesota corporation, Plaintiff,**

**v.**

**Robert L. Fields, Defendant.**

**Bankruptcy No. 10–50165.**
**Adversary No. 10–5019.**

United States Bankruptcy Court, D. Minnesota.

April 12, 2011.

Boris Parker, Parker & Wenner, P.A., Minneapolis, MN, for Plaintiff.

James A. Rubenstein, Terese A. West, Moss & Barnett, Minneapolis, MN, for Defendant.

## ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This is an adversary proceeding for determination of dischargeability of debt,

commenced in the Defendant's bankruptcy case.[1] It came before the Court on the Defendant's motion for summary judgment. The Defendant appeared by his attorney, Terese A. West. The Plaintiff appeared by its attorney, Boris Parker.

The Defendant's counsel framed the motion under two alternate theories. The first was that the Defendant is not personally liable to the Plaintiff on an underlying debt. The second was that the Plaintiff could not make out a prima facie case for nondischargeability in any event, under the elements identified in bankruptcy law. As to the latter theory, the Court denied the motion from the bench.[2] This order treats the balance of the motion.

As the dispute was ultimately submitted, it required a two-stage analysis. The first will address the Defendant's framing of the issue: whether, as of the date of the Defendant's bankruptcy filing, the Defendant was liable to the Plaintiff as a guarantor on the debt of a third party, a business entity of which he was the principal. The second arises under the Plaintiff's alternate framing: whether the pleading of the Plaintiff's complaint allows it to maintain a claim against the Defendant on a debt that he owes to it, on legal bases other than contractual liability.

## NATURE OF DEFENDANT'S MOTION

The Defendant has moved for summary judgment under Fed.R.Civ.P. 56, *as incorporated by* Fed. R. Bankr.P. 7056.[3] A movant comes forward under the rule, by placing the relevant evidentiary fruits of investigation and discovery before the court. On that record, and any made by the respondent, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

---

1. The Defendant filed for bankruptcy relief under Chapter 7 on February 15, 2010. The Plaintiff timely commenced this adversary proceeding.

2. The ruling from the bench was driven by the intensely factual nature of the subjective elements under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B), i.e., the debtor's intent and the creditor's reliance. Fact-finding on these issues often turns on determinations of the credibility of witnesses' statements as to historical events and parties' subjective states of mind. Such fact-finding is best reserved for a time after in-trial observation of witnesses' demeanor and their performance under cross-examination. The Defendant's counsel was expressly advised of this at the scheduling conference in this matter, when she announced her intention to move for summary judgment. She suggested that one line of pleaded defense could be addressed by motion, the lack of personal liability in the Defendant on the underlying debt. She proposed to base this defense on the lack of a legally-enforceable written personal guaranty in the documents for the underlying loan. This boded to present an issue of law alone, and one that might be dispositive of the whole

adversary proceeding. Hence, the scheduling order entered on July 9, 2010 expressly contemplated a narrower range of initial discovery procedures, limited to those best-suited to bring out the documentary proof on which this circumscribed line of defense would turn. The order limited the Defendant's contemplated motion for summary judgment to the single theory just described. Nonetheless, when the motion was filed, there it was, a request for summary judgment on dischargeability coupled with the theory of defense that the Court had acknowledged as *possibly* amenable to summary adjudication. And, the motion purported to reach the subjective elements under the theory of nondischargeability, even though the Court had put a moratorium on the taking of depositions—the form of discovery best-suited to test an opponent's case on the subjective elements. It was as if counsel had not been listening.

3. The wording of Fed. R. Bankr.P. 7056 is as simple as possible: "Rule 56 F.R.Civ.P. applies in adversary proceedings." Because this incorporates the civil rule wholesale for governance in an adversary proceeding in a bankruptcy case, all further citations will be to the civil rule alone.

material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a).

The analysis for a motion under Rule 56, then, is sequential:

*First*, is there a genuine dispute of material fact—i.e., a triable issue as to a fact necessary to satisfy an essential element of the claim or defense in question, under the governing law? [4]

*Second*, and only if there is no genuine dispute of material fact, does the governing law dictate judgment for the movant on the facts thus established as uncontroverted?

The parties to this adversary proceeding have somewhat different notions of the governing law. To some extent, their differences stem from alternate interpretations of the text of the Plaintiff's complaint. The question boils down to how many theories of personal liability are actually in suit under the complaint. To put it most charitably, the text of the complaint is sloppily drafted.

As the Defendant would have it, the Plaintiff has sued out only one basis for personal liability, founded in contract and evidenced (or not) by a promissory note. The Defendant argues that this theory fails as a matter of law under the Statute of Frauds, Minn.Stat. § 513.01. The Plaintiff's rejoinder is that it has sued out that basis for liability, plus two others that are properly before the Court, and none of them are amenable to summary adjudication.

It is best to analyze these approaches separately, each according to its own tenor and on the record presented for this motion.

## UNCONTROVERTED (DOCUMENTARY, TRANSACTIONAL, AND LITIGATION–RELATED) FACTS

Certain very basic, backdrop facts are established without controversy by the parties' submissions:

1. In 2008, the Defendant was engaged in several different lines of business. The one material to this lawsuit was the development of a commercial real estate project in Otsego, Minnesota, known as "Main Street Otsego." [5] The Defendant formed an artificial business entity, Main Street Otsego, LLC ("MSO"), through which he pursued the project.

2. The Plaintiff is a Minnesota corporation that maintains its principal office in Crystal, Minnesota. The Plaintiff operates as a lender in the commercial sector.

3. On November 6, 2008, the Plaintiff and MSO closed on a loan transaction under which the Plaintiff advanced $500,000.00.

4. The documents for the closing included a "Mortgage Note" and a mortgage instrument. These two documents contained the statement, "Drafted By: Priority Title, Inc." At the time, Priority Title, Inc. was owned in its entirety by "Owners and/or Managers of" the Plaintiff.[6]

5. The Mortgage Note:

There is no more detail than that, as to its nature or size.

---

4. The governing law determines which facts are material, for the purposes of determining whether the record demonstrates triable disputes of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

5. At several places in the record, the project is described as a "waterfront development."

6. This fact is recited in an "Affiliated Business Arrangement Disclosure Statement" signed by the Defendant and dated as of the date of the closing. This disclosure statement is in the record as Exhibit B to the Affidavit of Boris Parker, Esq. [Dkt. No. 18].

a. identifies "Community Finance Group, *LLC*" as the lender;

b. identifies "Main Street Otsego, LLC a corporation under the laws of Minnesota" as the party that "promise*d* to pay to the order of Community Finance Group, LLC"[7] the $500,000.00 plus interest;

c. provides for interest on unpaid principal at the rate of 14% per year, and a due date for payment in full of January 5, 2009;

d. contains the following, as its fourth full paragraph (out of five paragraphs total):

> The undersigned, whether principal surety, guarantor, endorser, or other party hereto, agrees to be jointly and severally bound, and hereby waives any homestead or exemption right against said debt and waives demand, protest and notice of demand, protest and nonpayment.

and,

e. is hand-signed once by the Defendant, over the following indicia for his signature line:

BY ———————

Robert L. Fields, CEO

Main Street Otsego, LLC

6. The mortgage instrument contains a pledge of two named lots and plats described as: "O*s* tsego [sic] Waterfront East First Addition, Wright County, Minnesota"[8] and "Otsego Waterfront East Second Addition, Wright County, Minnesota" for a debt of $500,000.00. In pertinent part, it:

a. again identifies "Community Finance Group, *LLC*" as the mortgagee;[9] and

b. is hand-signed once by the Defendant, over the following indicia for his signature line:

———————

Robert L. Fields
CEO of
Main Street Otsego, LLC

7. Neither the Mortgage Note nor the mortgage instrument identify in their text any borrower or mortgagor by name, other than Main Street Otsego, LLC. Neither contains any signatures other than the single one of the Defendant, in the places shown in findings 5 and 6 earlier.

8. MSO did not pay and satisfy the debt per the Mortgage Note, timely or otherwise. It paid interest and late fees to the Plaintiff on a regular (monthly) basis through May, 2009.

9. In early June, 2009, the Plaintiff sued MSO, the Defendant, and LandCor Companies, Inc. (another of the Defendant's business entities) in the Hennepin County District Court. Through its complaint, the Plaintiff asserted that the Defendant and LandCor were personally liable on the debt evidenced by the Mortgage Note, jointly and severally, and that the Defendant was liable on account of a personal guaranty.

10. On July 21, 2009, the Plaintiff obtained an *ex parte* Order for Prejudgment Attachment against the defendants in the state-court action, on the allegation that they would secrete or dissipate assets that otherwise could be subject to post-judgment execution.

---

**7.** The operative verb is in the *past* tense in the very text of the Mortgage Note itself. The italic on the last letter in the word in this quotation is added for emphasis.

**8.** Again, the italicization of the extraneous consonant is added for emphasis.

**9.** And again the italicization is added, for emphasis.

11. At a hearing conducted on July 31, 2009, the defendants there (including the Defendant here) moved to vacate the pre-judgment attachment. In a decision filed on October 6, 2009, the Hennepin County District Court (Bransford, J.) granted the motion and vacated the attachment. One of the issues was the proper scope of a judicially-imposed attachment against the assets of the various defendants. As to that, Judge Bransford stated:

> Main Street Otsego is the only defendant liable under the Note because the other two defendants did not sign the Note. Plaintiff has not presented a personal guaranty signed by Defendant Fields representing that he agreed to be personally liable for the loan. The Plaintiff did attach a letter to its Complaint written on LandCor letter head in which Defendant Fields begins his letter by stating "we recognize that we owe you ..." Defendant Fields signed the letter as CEO of LandCor Companies, Inc. Plaintiff asserts that Defendant Fields acknowledged that he as well as LandCor was responsible for the Note by submitting the letter to Plaintiff; however the letter does not qualify as a written agreement between the parties. Plaintiff has not submitted a contract, Note, or Mortgage to the Court in which Defendants Fields and LanCor [sic] acknowledge that they are also liable for the debt of Main Street Otsego; therefore, only Main Street Otsego is liable under the Note.

### ANALYSIS [10]

#### I. *The Defendant's Motion, as Originally Brought.*

The Defendant's argument on the issue at bar was originally presented in his supporting briefing. The development was less than one page long. In sum, the argument is as follows:

1. "Fields signed the [Mortgage] Note in his capacity as an officer of MSO, and not in his individual capacity," and "MSO is the only party that signed the Note." The evidentiary citation for this proposition is the executed note itself. The reference is clearly to the fact of a single holographic signature over a typed format of the Defendant's name with a designation of an official capacity in reference to MSO as its "CEO."

2. "[The Plaintiff's] contention that [the Defendant] promised to act as surety with respect to the Note is unsupportable." The accompanying citation is to a portion of the Plaintiff's complaint, in which the Plaintiff pleads that it relied on alleged oral promises by the Defendant to see that the note was paid by him from his personal assets, if MSO were not able to make good on the debt. There is no additional evidentiary citation for this proposition; but it clearly is based on a legal argument that no evidence could make the pleaded oral promise enforceable.

The Defendant then relies on Minnesota's Statute of Frauds, Minn.Stat. § 513.01, which provides in pertinent part as follows:

> No action shall be maintained, in either of the following cases, upon any agreement, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged therewith:
>
> . . . .

---

**10.** This section contains conclusions of law, a recapitulation of the remaining evidence, and a few additional findings of uncontroverted fact that go specifically to one side's theory or the other's.

(2) Every special promise to answer for the debt, default or doings of another . . .

He does not cite to any case law at all.

The Plaintiff's response to this theory of defense mingles and mumbles several strains of thought in a page and a half of briefing.

■ The first is apparently under a rubric of judicial estoppel. It is without merit.[11]

■ The second is that the paragraph noted above at finding 5 constitutes a guaranty by the Defendant in his individual capacity, because it contains a consent "to be jointly and severally bound" on the underlying debt. This provision is the only written undertaking that the Plaintiff offers as a guaranty to meet the Statute of Frauds. However, the wording of the Plaintiff's argument seems to mix in a different theory of direct personal liability, without identifying it as distinct from the notion of a guarantee. The Plaintiff argues that this provision memorializes that the Defendant "had agreed to be named a co-debtor on the Note," reflecting how "[i]t was always understood by [the Defendant] and I [sic], that he would be personally responsible as a co-signor [sic] of the Note. . . ."[12]

These thoughts were first voiced in the Plaintiff's complaint, though in a haphazard and imprecise fashion. The complaint names Robert L. Fields as the sole defendant, and recites:

1. "Plaintiff lent Defendant $500,000.00 and had Defendant Fields execute and deliver to Plaintiff a Mortgage Note memorializing the same." ¶ 8;

---

11. The argument is phrased as follows:

> Defendant Fields has represented under oath in Schedule F of his bankruptcy petition that the debt to Community Finance Group in the amount of $506,298.33 is his personal debt, in his capacity as a co-debtor with Main Street Otsego, LLC. This Bankruptcy Court has accepted Defendant Fields' representation and has allowed discharge under section 727, subject to this adversary proceeding. The attempts of Defendant Fields to now change his position and claim he does not owe any debt to CFG are in direct conflict to his earlier representations to this Court and attempt to reopen an already decided issue.

This seems to be an invocation of judicial estoppel; the Plaintiff would have the Defendant barred from denying personal liability because he included an entry in his bankruptcy schedules for the claim the Plaintiff had previously asserted against him. The argument is absurd. In the first place, the Defendant was required to schedule any and all claims that could have been asserted against him outside of bankruptcy, whether he agreed that they had merit or not. 11 U.S.C. § 521(a)(1)(B)(i) and Fed. R. Bankr.P. 1007(b)(1)(A). A particular entry in a bankruptcy schedule *might* constitute an "inconsistent position[ ] in the same or related litigation," *Hossaini v. Western Missouri Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir.1998), to establish the platform for judicial estopped. *See Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418 (8th Cir.2007) (judicial estoppel used to bar holder of fire insurance policy from asserting claim of over $93,000.00 for personal property losses against insurer, where she had valued her personal property at $7,340.00 in asset schedules for her bankruptcy filing "[i]n the year preceding the fire. . . ."). (The Plaintiff's counsel did not cite *Scott* in briefing or argument.) But, there is no trigger for judicial estoppel in the record for the Defendant's case. The content of the Defendant's filed schedule *shows no inconsistency with his current position*. The Defendant and his counsel made sure to designate the claim as "Disputed" in the appropriate column of his Schedule F. Such a designation reflects a debtor's formal legal position as to personal liability on a scheduled claim in a bankruptcy case. This one clearly evidences the Defendant's denial of his liability.

12. The quotations are from the Affidavit of Andrew Vilenchik, who identifies himself as the Plaintiff's "General Manager." [Dkt. No. 16], para. 14.

2. "Pursuant to the Note, Defendant*s* [sic] *promised* to pay the principal sum ..." of the Note, ¶ 9; but then:

3. "The Note also provided ... that, *in addition to* the obligation for repayment by [MSO], the undersigned Defendant Fields ...," ¶ 10, then quoting the language regarding joint and several liability quoted above at finding 5.d.[13]

This argument is a hodgepodge, but it will be construed as the assertion of two separate bases for contractual liability in the Defendant, on the underlying debt.

The first would be direct liability as a joint obligor. This theory has no merit, because of the way that the Plaintiff had the note worded.

The note itself identifies only MSO as the promisor of repayment. The indicium of the Defendant's status as signatory recites a capacity as an officer of MSO, but only that. The text of the note's first paragraph could have identified the Defendant by name as a promisor. The text block below the signature line could have added three words before the abbreviation "CEO"—"individually and as." Either or both of these simple expedients would require a court to characterize the Defendant as a joint obligor, an "other party hereto" under language reflecting a mutual intention to make the Defendant directly liable to the Plaintiff as a promisor. *E.g., Norwest Bank Minnesota North, N.A. v.*

*Beckler*, 663 N.W.2d 571, 578 (Minn.Ct. App.2003) ("An intent to be contractually bound is determined by the objective manifestations of the parties' words, conduct, and documents, and not by their subjective intent."). Their absence deprives the Plaintiff of that argument.

One could be a bit more charitable to the Plaintiff: the note's wording could be considered as ambiguous, on the basis of the naming of MSO alone as the promisor, in contrast to the imprecise language quoted at finding 5.d. However, such an ambiguity is to be construed against the Plaintiff, as the party that procured the drafting of the note through its related entity. *E.g., Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 148 (Minn.2002) ("... when contract language is reasonably susceptible of more than one interpretation it is ambiguous, and ambiguous contract terms must be construed against the drafter....").[14]

Under either application, there is no basis on which to characterize the Defendant as a joint recipient or direct beneficiary of the loan, or as a promisor in his individual capacity who would be equally and directly responsible for its repayment.

■ The other basis for imposing liability on the Defendant would be secondary, as guarantor of MSO's debt. This theory is not as directly or briefly analyzed; but in the end it does not avail the Plaintiff either.[15]

---

**13.** The italics in the several quotations are added for emphasis. The reference to "Defendant*s*" in the plural may be due to unproofread cutting-and-pasting from the Plaintiff's prebankruptcy complaint in a state court lawsuit.

**14.** The only Minnesota appellate opinion that comes close to comparable facts is *Johnson v. Sams,* 296 Minn. 112, 206 N.W.2d 925 (1973), but it is distinguishable on one crucial point of combined law and fact. In *Johnson v. Sams,* the named payee on a note was a

corporation that was not estopped from asserting a mutual intent to personally bind the individual signatories to the debt as a basis for suing them on the note, *where all of the parties knew that the corporation had not yet been legally formed.* Here, there is no issue that MSO was a valid corporate entity when the Defendant signed the note under the stated status of its CEO.

**15.** The theory is properly before this Court for a final determination. To her credit, the Defendant's counsel did not argue that Judge

In his responsive briefing, the Plaintiff's counsel relied solely on the passage quoted at finding 5.d. as the written "promise to answer for the debt" of MSO to meet the Statute of Frauds. Counsel did not cite a single court decision, in briefing or argument. The Defendant's briefed argument was not greatly more detailed than that; and, it was equally threadbare of references to judicial rulings.

But the cleaving line between the two was the Plaintiff's dual and alternate insistence: on the one hand, that the wording of the passage was sufficient to make out an enforceable guaranty; or alternately, that the issue of its sufficiency under the Statute of Frauds could be reached only at trial, given the parties' disagreement over their intent to bind the Defendant personally to MSO's debt. A principled resolution of this dispute requires far more work than either lawyer put into the parties' submissions. But to responsibly address the record, that must be done.

 An initial complication is posed by the presence of two different thoughts in relevant Minnesota jurisprudence. It has long been held that Minnesota's Statute of Frauds "must be given a liberal construction," at least as to the sufficiency of a writing's recitation of the consideration for a personal guaranty. *Hall v. Oleson*, 168 Minn. 308, 210 N.W. 84, 84–85 (1926). *See also Bartley v. BTL Enters., Inc.*, 490 N.W.2d 664, 667–668 (Minn.Ct. App.1992). A combination of separate documents may be considered to satisfy the statute, if given at the same time and if related to the same transaction. *Hall v. Oleson*, 210 N.W. at 84. On the other hand, the Minnesota courts have recognized the general principle that "a contract of guaranty is strictissimi juris, implying that it must be strictly construed in favor of the guarantor." *American Tobacco Co. v. Chalfen*, 260 Minn. 79, 108 N.W.2d 702, 704 (1961). *See also Federal Deposit Ins. Corp. v. University Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir.1985); *General Elec. Credit Corp. of Tenn. v. Larson*, 387 N.W.2d 734, 736 (N.D.1986).

The issue in *Hall v. Oleson* was whether the writing there satisfied the statute's requirement of "expressing the consideration." That is not the issue here. Nor does this matter involve an ambiguity within a document that is otherwise acknowledged to be a contract of guaranty. The issue at bar is whether the passage in question, in conjunction with the form of the Defendant's signature, sufficiently memorializes a deliberate undertaking on the Defendant's part to stand in his own right for MSO's debt to the Plaintiff—put another way, whether it constitutes his personal promise to repay the contractual obligation of the separate corporate entity. The question is whether there is even a contract of guaranty in the first place. The Plaintiff insists that there is. The Defendant maintains that the cited provisions do not create one expressly, and cannot be read in conjunction with the form of signature to do so.

There is one extant ruling from a Minnesota appellate court on the underly-

Bransford's ruling, quoted on p. 6, precludes the Plaintiff from asserting guarantor liability. An order partially vacating a prejudgment attachment would almost certainly *not* be "a final judgment on the merits," so as to trigger issue preclusion (collateral estoppel) under Minnesota law. *See Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn.2004) (elements of collateral estoppel). (The federal Full Faith and Credit Act, 28 U.S.C. § 1783, requires the federal courts to apply the preclusion doctrines as they are framed by the law of the original forum state. *The Minch Family LLLP v. Buffalo–Red River Watershed Dist.*, 628 F.3d 960, 966 n. 4 (8th Cir.2010); *In re Langeslag*, 366 B.R. 51, 59 n. 12 (Bankr. D.Minn.2007).)

ing issue. *B.J. Johnson Partners, LLC v. Koss Paint & Wallpaper, Inc.*, 2009 WL 911012 (Minn.Ct.App.2009) (unpublished).[16] Without citation to prior on-point authority from the Minnesota Supreme Court or the Minnesota Court of Appeals, the court in *B.J. Johnson Partners* held that "such a signature line," i.e., the separate signature of a corporate borrower's individual principal, with the designation of a capacity as guarantor, was not "an absolute prerequisite to the creation of a binding personal guaranty." 2009 WL 911012 at *4–5. It cited a decision of an intermediate appellate court in Florida, with a parenthetical countenancing the imposition of guarantor liability where the document creating the corporation's debt contained clear "language indicating personal liability" in the person signing as a corporate principal. *Id.* Assuming this ruling to have persua-

sive authority at most,[17] the issue would be whether the one sentence in question here "indicat[es] personal liability" in the Defendant, in a clear enough fashion.

The answer is that it does not. Further, the actual function of the text is reasonably evident, albeit in the nature of boilerplate slapped into place by the Plaintiff's own scrivener.

The passage has a specific choice of nouns, verb, and modifiers. Structured as such, the passage clearly does *not* amount to a knowing, specific undertaking by the Defendant of liability on MSO's debt. That would have been made clear by using the sort of unequivocal verbs, subject, and objects held adequate toward that end in the premises lease at issue in *B.J. Johnson Partners:*

**16.** A comparable thought underlies an earlier decision from one of the judges of the United States District Court for the District of Minnesota. *Trustees of the MN State Basic Building Trades Fringe Benefit Fund v. GibSons Constr. Enters., Inc.*, 2003 WL 21058163 (D.Minn. 2003) (corporate officer, director, and shareholder who executed collective bargaining agreement under express statement of corporate capacity alone, without separate signature line as guarantor, was made personally liable for company's financial obligations under CBA, by language in text that provided that agreement was "binding personally and individually upon" employer-corporation's officers and stockholders).

**17.** "Unpublished opinions [of the Minnesota Court of Appeals] are not precedential ..." Spec. R. Pract. (Minn. Ct. App.) 4. For the matter at bar, the *B.J. Johnson Partners* decision will be applied as the most likely tack of Minnesota law that is otherwise unsettled of record. This is not entirely salubrious, though. Despite its observation that "the confusion ... could have been avoided by the inclusion of a separate signature line for the guarantor," 2009 WL 911012 at *4, the decision was a little too chary toward the interests of inattentive lenders. Other jurisdictions have been somewhat more tough-minded;

even as they have recognized the possibility of a guaranty being created by language internal to a corporate-executed note, they have been more pointed in noting why a stricter insistence on form would make sense. *E.g., Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 217 N.Y.S.2d 55, 176 N.E.2d 74, 76 (1961) ("In modern times most commercial business is done between corporations, everyone in business knows that an individual stockholder or officer is not liable for his corporation's engagements unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice once as an officer and again as an individual.... the better rule is ... that the statement in the contract purporting to bind the signing officer individually is not sufficient for Statute of Frauds purposes without some direct and explicit evidence of actual intent.") Imposing a more "bright line" rule for the prerequisites of a guaranty would not burden lenders; the adoption of unambiguous form language would be virtually without cost. And there is no real return to be had from protecting sloppiness like the Plaintiff's. The shoddiness of the Plaintiff's loan documentation created the platform for a pitched dispute; it jacked up the costs of resolution of that dispute; and it burdened the two busy courts that had to address the dispute.

It is understood that *the undersigned Guarantor* is a substantial shareholder of said tenant and that Lessor has entered into this Lease *in reliance on this Guaranty.* Therefore, in consideration of the premises and for other consideration, the receipt of which is hereby acknowledged, *the undersigned, as Guarantor,* agrees:

> 1. *The undersigned does hereby unconditionally, absolutely and continually guarantee the full and faithful payment and performance by the Lessee under this Lease* of all the terms, conditions and covenants contained in said Lease which are to be by Lessee kept and performed.

2009 WL 911012, at *3 (emphasis added). The words of the single sentence in *B.J. Johnson Partners* set up a straight chain of legal responsibility from the signatory— "the undersigned Guarantor"—to the obligee of the corporate lessee. The text features the customary, lawyerly redundancy in its wording, particularly in its modifiers; but all of this is toward a single, distinct reference point that is unmistakable.

By contrast, the verbiage of the Plaintiff's text is in the alternative, in several different senses. It does not designate specific persons or entities, singly or in the multiple. It scatters out a variety of possible signatory-statuses for the referent party or parties "hereto." Most to the point, the specific covenant does not contemplate a hierarchy or order of liability, as between a primary obligor (here, as most often, a corporate entity) and an additional but secondary party extending an accommodation to the primary (i.e., an individual principal of that corporation). Rather, this text has every semblance of boilerplate, thrown into a form in order to make all of *multiple* persons who actually signed *under designated but different capacities,* equally and simultaneously liable *in those designated capacities.* The text clearly is designed to enable the payee to collect the full amount of the underlying debt from any one of all signatories, in the classic sense of joint and several liability.

But the wording really cannot sustain any function other than that. The choice of noun, verb, and objects simply does not signify a specific "promise" on the part of the Defendant as an individual "to answer for the debt" of MSO. And because the sole signature on the note was by the Defendant in a designated corporate capacity, there was no multi-party execution of the note to trigger this provision. It was mere surplusage—boilerplate, indeed.

Plaintiff relies on this writing alone, and it does not make out a guaranty by the Defendant that is sufficient on its face to satisfy the Statute of Frauds. The Defendant is not individually liable to the Plaintiff on a contractual basis, on account of the Plaintiff's loan advanced to MSO. The consequence is that there was no debt running from the Defendant to the Plaintiff as a matter of contract, and the Plaintiff cannot maintain an action against the Defendant for determination of dischargeability on that theory. The governing law limits the material facts to the face of the relevant documents, which are uncontroverted; and on those admitted facts, the Defendant is entitled to summary judgment against the Plaintiff on that pleaded theory of liability. There is no debt under the note to be subjected to discharge in bankruptcy, or excepted from it.

## II. *The Plaintiff's Response, Broadening Out the Asserted Bases for Liability.*

For her argument on summary judgment, the Defendant's counsel limited the legal theory to the notions of liability as guarantor and the Statute of Frauds, as she had first broached at the scheduling conference. The tactic promised to end

this litigation, at least if the sole basis for personal liability in suit were that and that alone.

In the Plaintiff's response, its counsel asserted that his client had actually raised other bases for personal liability, and that this adversary proceeding could be maintained on any of them even were the Defendant successful on the focused attack of his motion. Apart from the judicial estoppel argument rejected *supra* at n.11, the theories are summarized as follows in the Plaintiff's responsive brief:

1. "Defendant Fields completely ignores legal precedent applicable to the case at bar that a corporate officer may be held personally liable for a corporation's tortuous [sic] act, in particular fraud, if the officer actually participated in the act."

2. "Likewise, in addition to personal liability by Defendants Fields' [sic] for operation of [MSO] for purposes of perpetrating a fraud against Plaintiff, Defendant conveniently ignores the existence of legal principles and a factual basis for this Court to consider at trial whether or not to pierce the corporate veil and to treat the corporation's debt as Defendant Fields' personal debt."

The latter theory is more quickly addressed.

■ Under Minnesota law, piercing the corporate veil is akin to an extraordinary remedy. *Universal Lending Corp. v. Wirth Companies, Inc.*, 392 N.W.2d 322, 326 (Minn.Ct.App.1986) ("An officer and shareholder of a corporation cannot be held personally liable for the obligations of the corporation except in certain limited circumstances."); *Groves v. Dakota Printing Servs., Inc.*, 371 N.W.2d 59, 62 (Minn. Ct.App.1985); *Anderson v. Benson*, 394 N.W.2d 171, 175 (Minn.Ct.App.1986). *See also Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn.1979) ("Doing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating."); *HealthEast v. County of Ramsey*, 770 N.W.2d 153, 157–158 (Minn.2009) ("an entity's separate corporate status for tax purposes" will be disregarded "only in limited circumstances"). The remedy of piercing the corporate veil is equitable in nature. *West Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 898 n. 3 (Minn.1981). It involves both factual and equitable considerations. *Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir.1997) (applying Minnesota law).

■ First, a combination of factual circumstances must be shown, to establish that the individual principal formed or maintained the corporation as his personal alter ego, ignoring the separateness of corporate form. Factors that would support a finding of identity between individual principal and corporation include (1) insufficient capitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of debtor corporation; (5) siphoning of corporation as a mere facade for individual dealings. *Victoria Elevator Co.*, 283 N.W.2d at 512; *Assoc. of Mill and Elevator Mut. Ins. Co. v. Barzen Intern., Inc.*, 553 N.W.2d 446, 449–450 (Minn.Ct.App.1996). Then, there must be "an element of injustice or a fundamental unfairness," that would result from honoring the nominal separateness of the corporation. *Victoria Elevator Co.*, 283 N.W.2d at 512; *Whitney v. Leighton*, 225 Minn. 1, 30 N.W.2d 329, 333 (1948); *Waterman v. Harold*, 1990 WL 92869 *2 (Minn.Ct.App.1990). *See also United States v. Scherping*, 187 F.3d 796, 802 (8th Cir.1999) and *Minnesota Power v. Armco, Inc.*, 937 F.2d 1363, 1367 (8th Cir.1991) (both discussing Minnesota law).

■] This discussion jumps the gun, however; the threshold issue is whether the Plaintiff even pleaded a request for the underlying, extraordinary relief in the first place, i.e., whether the issue is even in suit in this adversary proceeding. The words "pierce the corporate veil" do not even appear in the complaint. But that is not dispositive. As the United States Supreme Court recently observed,

> a complaint need not pin [a] plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible "short and plain" statement of the plaintiff's claim, not an exposition of his legal argument.

*Skinner v. Switzer*, —— U.S. ——, 131 S.Ct. 1289, 1296, 179 L.Ed.2d 233 (2011). The Minnesota Supreme Court invoked the same thought, in the specific context of the remedy now at bar. *Barton v. Moore*, 558 N.W.2d 746, 749–750 (Minn.1997).

■] However, this is just a statement of relative lenity as to the abstract *legal* dimension of a pleading. To withstand dismissal on motion of a defendant, a complaint must recite sufficient *"facts* to state a claim to relief that is *plausible on its face." Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

■] In the specific substantive context at bar, that requirement is met when the plaintiff seeking to pierce the corporate veil "allege[s] numerous facts" going to the factors of identity and the asserted inequity, so as "to provide [the opposing party] with notice of such a theory." *Barton v. Moore*, 558 N.W.2d at 749–750. The Plaintiff did not do that at all. The relevant text of its complaint (two and a half pages in length) does not even suggest that the Plaintiff was seeking to have individual liability imposed on the Defendant on a pass-through basis, for a debt that it acknowledged as contractually owing only by MSO.[18] Hence, the theory of liability is not before the Court, and the Plaintiff has no right to maintain suit on it going forward.[19]

Then there is the Plaintiff's ultimate fallback, to impose liability on the Defendant for inducing the lending that brought about the underlying liability of MSO. This time the predicate corporate liability would sound noncontractually—in fraud— as well as under contract.

---

**18.** To the contrary, the identification of parties to be held liable is vague and sometimes contradictory. The Plaintiff identified both the Defendant and MSO as equally and directly liable, and that alone. But if the complaint were to read or be read as demanding the piercing, it has no recitation of any facts going to the legal prerequisites: multiple, specific instances of misuse or non-use of corporate formalities plus an ulterior abuse, chicanery, or injustice on the part of the individual corporate principal in direct conjunction with that party's interposition of a flawed corporate form against personal responsibility for debt. The complaint is not merely the sort of conclusory, legalistic cant rejected in *Twombly* and *Iqbal;* it is entirely devoid of *any* averment of fact material to this late-proffered theory of liability.

**19.** The underlying considerations evolved out of the application of Rule 12(b)(6), and as such they are more squarely applied in a motion for dismissal under that rule. However, they dovetail exactly to the analysis of whether the Plaintiff even pled out this alternate theory of liability, which it articulated for the record only when it had to defend the motion at bar.

The Plaintiff maintains that it was deceived into lending half a million dollars to MSO by representations that MSO had a sound financial structure and business plan; that it was at a crucial stage in a project that could reach profit-generating fruition within a few months; and that MSO only needed a bridge financing from the Plaintiff to get over that hump. The Plaintiff identifies the Defendant as the individual who made these representations on behalf of MSO; it impugns all of them as grossly false. The argument is built out in a patchwork of concepts that do not always signify the same notion of culpability:

1. "Defendant Fields Is Personally Liable For The Fraudulent Conduct Of The Entities He Controls and Directs Exclusively."

2. "[A] corporate officer may be held personally liable for a corporation's tortious act if the officer actually participated in the act," or "knowingly acquiesced in the [corporation's] conduct." And,

3. The Defendant as "the mastermind and direct perpetrator of [a] fraud against" the Plaintiff, committed a tort intertwined with that of MSO.

Counsel cites a number of decisions, most of them from Minnesota courts but all decided on legal sources of corporate liability that are very different from the one at bar.[20]

■ It is not necessary to parse out the theories used by the courts that rendered those decisions.[21] There is a simpler notion of liability in the Defendant, which is supported by on-point precedent that is over four decades old. It fits the historical dynamic described by the Plaintiff: a corporate principal may be held personally liable in tort, to a creditor of the corporation, if the individual himself induced an extension of credit to the corporation (and the corporation alone, as sole contractually-liable party) by knowingly misrepresenting material facts concerning the corporation to the prospective lender to induce the extension of the credit, and the corporation later defaulted in payment and went defunct without satisfying the debt. *Consolidated Foods Corp. v. Pearson*, 287 Minn. 305, 178 N.W.2d 223 (1970).

The individual's underlying liability would arise under state tort law, that of fraud or misrepresentation. To the extent that the underlying elements under state law coincided with those under bankruptcy law (11 U.S.C. § 523(a)(2)(A)), or the plaintiff-creditor rounded out the proof as to both, there would be an independent factual basis to attach liability to a defendant-debtor in bankruptcy, and to except that individual's debt from discharge. The Eighth Circuit Court of Appeals has countenanced such a result for over two decades, and recently reaffirmed the ap-

---

**20.** Counsel cites a jumble of decisions that impose vicarious or imputed liability on corporate principals, on a wide range of backdrop law: *Ford Motor Co. v. B & H Supply, Inc.*, 646 F.Supp. 975 (D.Minn.1986) (trademark infringement); *Federal Trade Comm'n v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282 (D.Minn.1985) (deceptive sales practices); *State by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888 (Minn.Ct.App.1992), *aff'd*, 500 N.W.2d 788 (Minn.1993) (false advertising, deceptive trade practices, consumer fraud); *Piper Jaffray Cos., Inc. v. Nat'l Union*

*Fire Ins. Co.*, 967 F.Supp. 1148 (D.Minn.1997) (vicarious liability for subordinate's tortious misconduct); and so forth. It all seems to get very complicated and seems to go a distance afield.

**21.** One suspects that at least some of them entailed statutes that expressly impose liability on individual corporate principals for their participation in conduct deemed wrongful, but that is nominally perpetrated by their corporations.

proach. *In re Freier,* 604 F.3d 583 (8th Cir.2010), *rev'g* 402 B.R. 891 (8th Cir. BAP 2009); *In re Dallam,* 850 F.2d 446, 449 n. 2 (8th Cir.1988).

 As it turns out, the Plaintiff's complaint does plead a claim against the Defendant individually for misrepresentation under Minnesota law, under which the gravamen is an inducement to the Plaintiff to lend to MSO that was effected by the misrepresentation of MSO's (and other parties') financial status. The Plaintiff alleges in its complaint that:

1. the Defendant solicited "emergency funding" from the Plaintiff, to MSO, "to finance construction and tenant improvements" for MSO's waterfront commercial development;
2. he did so using financial statements for himself and MSO, plus other business entities of his, that recited substantial net worth for him, substantial value in MSO, and substantial and encumbered assets in the other entities;
3. he also used a "rent revenue report" for MSO's development, that showed "sufficient rent allocation from tenants ... to cover the first mortgage and related obligations" for the project;
4. the representations were false at the time given, because rent revenues were less than represented, the primary lender had been threatening foreclosure and MSO needed to make payment to forestall that rather than to finance the improvements, and the financial condition of MSO, the Defendant, and the Defendant's other businesses was vastly worse than represented;
5. the Plaintiff relied on these representations to lend $500,000.00 to MSO, and would not have done so had it known the truth;
6. MSO failed to timely pay off the 60–day note in favor of the Plaintiff, and never made principal payments on the debt; and
7. the Plaintiff suffered the loss of the full amount of principal advanced plus unpaid interest and other amounts as a result of the Defendant's representations.

These factual allegations all go to the recognized elements of fraud under "the dominant consensus of common-law jurisdictions," which underlies both the construction of § 523(a)(2)(A) under Eighth Circuit precedent and the tort of fraudulent misrepresentation under Minnesota law. *In re Freier,* 604 F.3d at 588 n. 2. Though the Plaintiff's pleading does not request an award of damages for common-law fraud per se, it does not limit its theory of recovery against the Defendant to liability as co-maker or guarantor. Though lacking a differentiated theory, its prayer for an award of damages and entry of a money judgment passes muster as a complaint in tort under *Skinner v. Switzer.*[22]

The Plaintiff has sued out a request for judgment against the Defendant that is independent of its assertion of guarantor liability. Thus, the Defendant is not entitled to a grant of summary judgment that would fully terminate this adversary proceeding. It will proceed to trial on the theory of liability just described, though on that one alone.

**22.** And, to settle an issue inherent though unraised: the Eighth Circuit recently held that the bankruptcy court has jurisdiction and authority in dischargeability litigation to order and enter judgment on the underlying debt, as well as to determine dischargeability. *In re Ungar,* 633 F.3d 675 (8th Cir.2011).

DISPOSITION

IT IS THEREFORE DETERMINED AND ORDERED:

1. The Defendant is not personally indebted to the Plaintiff under a promissory note in favor of the Plaintiff that was executed by the Defendant in a capacity as CEO of Main Street Otsego, LLC on November 6, 2008, either as a promisor or as a guarantor.

2. In this adversary proceeding, the Plaintiff may not seek to have the Defendant found personally liable to it on the ground that the corporate veil of Main Street Otsego, LLC may be pierced, and that the Defendant therefore is obligated to the Plaintiff on the debt of Main Street Otsego, LLC to the Plaintiff.

3. The Defendant's motion for summary judgment is denied in all other respects.